# 14-4369cv(L)

(Related Case No. 14-4509-cv (XAP))

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

EMI CHRISTIAN MUSIC GROUP, INCORPORATED, PRIORITY RECORDS, LLC, BEECHWOOD MUSIC CORPORATION, COLGEMS-EMI MUSIC, INCORPORATED, EMI APRIL MUSIC, INC., EMI BLACKWOOD MUSIC, INC., EMI FULL KEEL MUSIC, INC., EMI GOLDEN TORCH MUSIC CORPORATION, EMI LONGITUDE MUSIC, EMI VIRGIN MUSIC, INC., EMI VIRGIN SONGS, INC., CAPITOL RECORDS, LLC,

*Plaintiffs–Counter-Defendants–Appellees–Cross-Appellants,*

(See Inside Cover for Continuation of Caption)

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**PROOF BRIEF FOR PLAINTIFFS–APPELLEES–CROSS-APPELLANTS**

Frank P. Scibilia
M. Mona Simonian
Ross M. Bagley
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036
(212) 421-4100

Andrew H. Bart
JENNER & BLOCK LLP
919 Third Avenue
37th Floor
New York, NY 10022
(212) 891-1600

Luke C. Platzer
J. Douglas Wilson
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Attorneys for Plaintiffs–Appellees–Cross-Appellants*

EMI AL GALLICO MUSIC CORPORATION, EMI ALGEE MUSIC CORPORATION, EMI FEIST CATALOG, INC., EMI GOLD HORIZON MUSIC CORP., EMI GROVE PARK MUSIC, INCORPORATED, EMI HASTINGS CATALOG, INCORPORATED, EMI MILLS MUSIC, INCORPORATED., EMI MILLER CATALOG, INCORPORATED, EMI ROBBINS CATALOG, INCORPORATED, EMI U CATALOG, INC., EMI UNART CATALOG, INC., JOBETE MUSIC COMPANY, INCORPORATED, SCREEN GEMS-EMI MUSIC, INCORPORATED, STONE AGATE MUSIC, STONE DIAMOND MUSIC CORPORATION,

*Plaintiffs–Appellees–Cross-Appellants,*

CAPITOL RECORDS, INCORPORATED, CAROLINE RECORDS, INC., VIRGIN RECORDS AMERICA, INC.,

*Plaintiffs–Counter-Defendants,*

*– v. –*

MP3TUNES, LLC,

*Defendant–Counter-Claimant–Cross-Appellee,*

MICHAEL ROBERTSON,

*Defendant–Appellant–Cross-Appellee.*

# CORPORATE DISCLOSURE STATEMENT

1.      Plaintiff Capitol Records, Inc. has changed its name to Capitol Records, LLC, and Plaintiffs Caroline Records, Inc. and Virgin Records America, Inc. have been merged into Plaintiff–Appellee–Cross-Appellant Capitol Records, LLC.

Plaintiff–Appellee–Cross-Appellant Capitol Records, LLC is a Delaware limited liability company.  Capitol Records, LLC's parent companies include Virgin Records CM Holdings, Inc., a Delaware corporation; EMI RM US, Inc., a Delaware corporation; EMI Group Inc., a Delaware corporation; and Universal Music Group, Inc., a Delaware corporation.  The ultimate parent of Capitol Records, LLC is Vivendi, S.A., a publicly traded French corporation.

2.      Plaintiff–Appellee–Cross-Appellant Priority Records, LLC is a Delaware limited liability company.  Priority Records, LLC's parent companies include EMI Delaware Holdings Inc., a Delaware corporation; EMI Group Inc., a Delaware corporation; and Universal Music Group, Inc., a Delaware corporation. The ultimate parent of Priority Records, LLC is Vivendi S.A., a publicly traded French corporation.

3.      Plaintiff–Appellee–Cross-Appellant EMI Christian Music Group, Inc., n/k/a Capitol Christian Music Group, Inc., is a California corporation.  Capitol Christian Music Group, Inc.'s parent companies include EMI Group Inc., a

Delaware corporation; and Universal Music Group, Inc., a Delaware corporation. The ultimate parent of Capitol Christian Music Group, Inc. is Vivendi S.A., a publicly traded French corporation.

4.     No publicly traded company other than Vivendi S.A. owns more than 10% of the stock of the Capitol Records, LLC, Capitol Christian Music Group, Inc., or Priority Records, LLC (collectively "Label Plaintiffs").

5.     Plaintiffs–Appellees–Cross-Appellants Beechwood Music Corp., Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music, EMI Full Keel Music, EMI Golden Torch Music Corp., EMI Longitude Music, EMI Virgin Music, Inc., EMI Virgin Songs, Inc., EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI Feist Catalog, Inc., EMI Gold Horizon Corp., EMI Grove Park Music, EMI Hastings Catalog, EMI Mills Music, EMI Miller Catalog, Inc., EMI Robbins Catalog, Inc., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., Screen Gems-EMI Music, Inc., Stone Agate Music, and Stone Diamond Music (collectively "Publishing Plaintiffs") are partially-owned, indirect subsidiaries of Sony Corporation, a publicly traded company organized under the laws of Japan.

6.     No publicly traded company other than Sony Corporation owns more than 10% of the stock of Publishing Plaintiffs.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... vii

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

ISSUES PRESENTED ON ROBERTSON'S APPEAL .............................3

ISSUES PRESENTED ON CROSS-APPEAL...........................................4

STATEMENT OF THE CASE...................................................................5

      A.    Robertson's Business Model for MP3tunes and
           Sideload.com .......................................................................6

      B.    Procedural History and Pretrial Rulings ...............................8

      C.    Reconsideration Order.........................................................10

      D.    Trial and Jury Verdict ........................................................10

      E.    The JMOL Ruling ...............................................................12

SUMMARY OF ARGUMENT ..............................................................13

ARGUMENT ..........................................................................................16

I.    DMCA ISSUES ............................................................................16

      A.    MP3tunes Was Ineligible for DMCA Protection Because
           It Failed to Establish that It Had a Reasonably
           Implemented Repeat Infringer Policy .................................16

           1.    MP3tunes Failed to Connect Known Infringing
                  Activity to Sideload.com Users ...............................17

           2.    The District Court Erred in Concluding that
                  Tracking or Terminating Repeat Infringers Using
                  Sideload.com Was Unnecessary ...............................19

iii

3.      Terminating Users Who Shared Locker Passwords Did Not Satisfy the Statute ......................................21

4.      The Repeat Infringer Holding Deprived Plaintiffs of Significant Claims ................................................23

B.      The Jury Properly Found MP3tunes Disqualified from DMCA Protection with Respect to Numerous Infringements by Its Users ............................................24

     1.      Substantial Evidence Supported the Willful Blindness Verdict ......................................................25

         a.      The Specific Factual Context of MP3tunes's Operations Informed and Supported the Jury's Findings ........................................25

         b.      Awareness of High Likelihood of Specific Infringing Activity ........................................27

         c.      Conscious Avoidance of Knowledge as to Specific Details of Infringement ........................29

     2.      The District Court's Interpretation of Section 512(m) Was Erroneous and, if Accepted, Would Swallow the Willful Blindness Doctrine ....................31

     3.      The District Court Wrongly Dismissed Evidence of Infringement of The Beatles Tracks as Insufficiently Specific ...........................................33

     4.      The District Court Correctly Sustained the Secondary Infringement Verdict With Respect to Sites Used by MP3tunes Executives to Infringe Personally ........................................................35

     5.      The Identifiability of the Infringing Files Also Supported the Jury's Red Flag Knowledge Verdict ................38

C.      It Was Error to Apply the DMCA to Infringement of Pre-1972 Sound Recordings ........................................39

II.      ROBERTSON'S PERSONAL LIABILITY ISSUES ..................41

iv

A.    Robertson is Subject to this Court's Jurisdiction ...............................41

    1.    Robertson's Contacts With New York Satisfied
       Due Process .............................................................................43

    2.    *Walden v. Fiore* Does Not Counsel a Different
       Conclusion ...............................................................................45

B.    The District Court Properly Sustained the Jury's
    Secondary Liability Verdict ...............................................................47

    1.    Robertson Was a Classic Vicarious Infringer..........................47

       a.    The District Court Correctly Instructed the
          Jury.................................................................................47

       b.    Trial Evidence Demonstrated Robertson's
          and MP3tunes's Direct Financial Interest in
          Infringing Activity ........................................................49

    2.    The Jury's Verdict on Robertson's Contributory
       Liability Should Be Upheld On Appeal....................................51

    3.    The District Court Correctly Declined to Instruct
       the Jury on the *Sony* Exception..............................................55

III.    DIRECT INFRINGEMENT ISSUES. .........................................................56

A.    The District Court Correctly Sustained the Jury's Cover
    Art Direct Infringement Verdict.........................................................56

    1.    Plaintiffs Properly Registered the Cover Art as
       Works for Hire .........................................................................57

    2.    MP3tunes, Not its Users, Caused the Infringing
       Copying ....................................................................................59

    3.    The DMCA Does Not Protect MP3tunes's Own
       Copying and Storage of Cover Art Images...............................61

B.    Substantial Evidence Supported the Jury's *Respondeat
    Superior* Verdict ...............................................................................62

IV.    STATUTORY DAMAGES ISSUES ..........................................................64

A.    The District Court Erred in Limiting Plaintiffs to a Single Damages Award for Infringement of the Respective Copyrights in Separately Owned Recordings and Compositions .......................................................................... 64

B.    The District Court Correctly Permitted Awards of Statutory Damages for Separately Exploited Sound Recordings ...................................................................................... 67

V.    PUNITIVE DAMAGES ISSUES .................................................. 68

A.    The Punitive Damages Award Comports with Due Process ....................................................................................... 68

1.    Robertson's Copyright Theft Involved Trickery and Deceit ............................................................... 69

2.    Robertson's Conduct Threatened Significant Harm ................. 70

3.    Other Factors Support the Award ............................................ 71

B.    If the Court Reinstates the Secondary Infringement Verdict, the Jury's Punitive Damages Should be Reinstated ...................................................................................... 72

CONCLUSION ........................................................................................ 73

SUMMARY OF CLAIMS AND DISPOSITIONS AT ISSUE ............................. 75

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in relevant part*, 239 F.3d 1004 (9th Cir. 2001) .............................50

*ABC v. Aereo, Inc.*, 134 S. Ct. 2498 (2014).......................................................23, 24

*Arista Records, Inc. v. Flea World, Inc.*, No. 03-cv-2670, 2006 WL 842883 (D.N.J. Mar. 31, 2006)..........................................................................56

*Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002)....................................................................48

*Arista Records LLC v. Lime Group LLC*, No. 06-cv-5936, 2011 WL 1311771 (S.D.N.Y. Apr. 4, 2011)........................................................................67

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011)..............................................................................48, 51, 53, 54

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009).......................................................................48, 51, 52, 54, 56

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120 (2d Cir. 2002)...........................................................................................43

*Beastie Boys v. Monster Energy Co.*, 66 F Supp 3d 424 (S.D.N.Y. 2014) ...................................................................................................................65

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) .................69, 70, 71, 72

*Boisson v. Banian, Inc.*, 273 F.3d 262 (2d Cir. 2001) .............................................57

*Bryant v. Media Right Productions, Inc.*, 603 F.3d 135 (2d Cir. 2010)......16, 66, 67

*C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, 771 F.3d 59 (1st Cir. 2014) ......................................................................................................45

*Calder v. Jones*, 465 U.S. 783 (1984)........................................................44, 45, 46

*Capitol Records, LLC v. Escape Media Group, Inc.*, No. 12-cv-6646, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015).............................................17, 19

*Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471 (2d Cir. 2004) ................................................................................40

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ..........................................................................55, 60

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) ...........................................................................45, 46

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ................................................................................26

*Cooley v. Penguin Group (USA), Inc.*, 31 F. Supp. 3d 599 (S.D.N.Y. 2014) ................................................................................19

*Datatech Enterprises LLC v. FF Magnat Ltd.*, No. C 12-04500, 2013 WL 1007360 (N.D. Cal. Mar. 13, 2013) ............................................18

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)....................................................61

*Disney Enterprises v. Hotfile Corp.*, No. 11-20427-civ, 2013 WL 6336286 (S.D. Fla. Aug. 28, 2013)...................................... 17, 19, 21, 22, 51, 53

*Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013)........................................................................42

*Eades v. Kennedy, PC Law Offices*, No. 14-104-CV, -- F.3d --, 2015 WL 3498784 (2d Cir. Jun 4, 2015)..................................................45

*Eckes v. Card Prices Update*, 736 F.2d 859 (2d Cir. 1984) ...................................59

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)........................................47, 48

*Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302 (2d Cir. 2013)................................................................16

*Gershwin Publishing Corp v. Columbia Artist Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971) ....................................................47, 48, 52

*Greenwich Film Productions, S.A. v. DRG Records, Inc.*, 833 F. Supp. 248 (S.D.N.Y. 1993)........................................................58

*Highland Capital Management  LP v. Schneider*, 607 F.3d 322 (2d Cir. 2010) ...........................................................................16

*Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996).................................................70, 71

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) .................................................................. 43, 45-46

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996)............................................................42

*Mid-Michigan Computer Systems, Inc. v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005) ........................................................71

*Mrs. U.S. National Pageant, Inc. v. Miss U.S. Organization, LLC*, 875 F. Supp. 2d 211 (W.D.N.Y. 2012)........................................46

*Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100 (2d Cir. 2001) ......................................................................52

*Payne v. Jones*, 711 F.3d 85 (2d Cir. 2013)...........................................70

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002).............................................................20

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007) ............................70

*Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18 (2d Cir. 1988)...................44

*Robert Stigwood v. O'Reilly* 503 F.2d 1096 (2d Cir. 1976) ...................66

*Roy Express Co. Establishment of Vaduz v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095 (2d Cir. 1982) .......................................71

*Softel, Inc. v. Dragon Medical & Science Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997) ................................................51

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)...............................................................55, 60

*Spooner v. EEN, Inc.*, No. 08-cv-262-P-S, 2010 WL 1930239 (D. Me. May 11, 2010)..........................................................65

*State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003).............................................................69, 71

ix

*TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546 (S.D.N.Y. 2001) ..................................................................................59, 65

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ........................29, 32, 34

*TXO Productions Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993) ............................................................................................69

*UMG Recording v. Escape Media Group*, No. 11 Civ. 8407, 2014 WL 5089743 (S.D.N.Y. Sept. 29, 2014)....................................................53

*UMG Recordings, Inc. v. Escape Media Group, Inc.*, 964 N.Y.S.2d 106 (App. Div. 2013) ..................................................................40

*UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) ....................................................................................6

*United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012) ......................................32, 33

*United States v. Butler*, 646 F.3d 1038 (8th Cir. 2011) ..........................................32

*Vasbinder v. Scott*, 976 F.2d 118 (2d Cir. 1992) ....................................................72

*Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ............................................................... 10, 25, 30, 31, 33, 34, 36, 38, 62

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ................................................................46

*Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013) .........................71

*Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452 (2d Cir. 1989) ....................................................................................................59

*Whitney v. Citibank, N.A.*,782 F.2d 1106 (2d Cir. 1986)........................................72

## STATUTES

17 U.S.C. § 115 ........................................................................................................66

17 U.S.C. § 301(c) ..............................................................................................14, 40

17 U.S.C. § 410(c) ...................................................................................................57

17 U.S.C. § 411(b) ...................................................................................................59

17 U.S.C. § 504(c)(1) ...................................................................................64

17 U.S.C. § 512(a)(1)(A) ..............................................................................22

17 U.S.C. § 512(c) ...........................................................................24, 40, 61

17 U.S.C. § 512(c)(1)(A)(i) ..........................................................................34

17 U.S.C. § 512(c)(1)(A)(ii) .........................................................................38

17 U.S.C. § 512(d)(1)(B) ..............................................................................38

17 U.S.C. § 512(g)(2)(A) ..............................................................................20

17 U.S.C. § 512(i)(1)(A) ...........................................................9, 16, 17, 19, 21

17 U.S.C. § 512(m) ..................................................................................14, 31

28 U.S.C. § 1291 ..............................................................................................3

28 U.S.C. § 1331 ..............................................................................................2

28 U.S.C. § 1338(a) .........................................................................................2

28 U.S.C. § 1338(b) .........................................................................................2

28 U.S.C. § 1367 ..............................................................................................2

N.Y. Penal Law § 275.05 ..............................................................................71

Act of Oct. 15, 1971, Pub. L. 92-140, 85 Stat. 391 .....................................40

## LEGISLATIVE MATERIALS

S. Rep. No. 105-190 (1998) .....................................................................35-36

## OTHER AUTHORITIES

37 C.F.R. § 202.3(b)(1) .................................................................................58

37 C.F.R. § 202.3(b)(4)(i) .............................................................................58

37 C.F.R. § 202.3(b)(4)(i)(A) ........................................................................58

Copyright Office, *Copyright Registration for Sound Recordings,*
  Copyright Circular # 56 (Aug. 2012),
  http://copyright.gov/forms/formsr.pdf .............................................. 57

Copyright Office, *Works Made for Hire,* Copyright Circular #09
  (Sept. 2012) ................................................................................ 58

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*
  § 14.04[E][1][d] (2015) ............................................................. 65

U.S. Copyright Office, *Federal Copyright Protection For Pre-1972*
  *Sound Recordings: A Report of the Register of Copyrights* (2011),
  http://www.copyright.gov/docs/sound/pre-72-report.pdf ........................... 40-41

# INTRODUCTION

Following a four-week trial, a jury found Michael Robertson and his company MP3tunes, LLC ("MP3tunes") liable for willful copyright infringement and awarded Plaintiffs $48,061,073. This award was modified by the District Court after trial, and judgment was entered for $12,241,531 against Robertson. Both parties have cross-appealed from the judgment and various prior orders.

Robertson has made a nine-figure fortune creating and running companies that exploit others' intellectual property without authorization or payment. His previous music site venture, MP3.com, was the subject of one of the largest copyright infringement judgments ever entered in the Southern District of New York, totaling approximately $53 million. As Robertson admitted, he created MP3tunes to finish the mission of MP3.com. It should come as no surprise, therefore, that infringement at MP3tunes was rampant.

MP3tunes's main business was to rent "lockers" where users could store and stream music. To stimulate demand for the lockers, Robertson created a sister site, Sideload.com, that lured potential users with what it promised were "free" music files. Robertson, MP3tunes's employees, and its users found these files (almost always in the "MP3" file format) elsewhere on the Internet and "ripped" them to the two sister sites using software created by MP3tunes, where they could be copied or streamed by the public—all without a license. Robertson set up this

1

system knowing that, at the time, no major record label made music available commercially in the MP3 format because such files could be endlessly reproduced, and thus that any major-label music files available in this format would be infringing. The jury concluded, reasonably, that Robertson and MP3tunes had willfully infringed thousands of Plaintiffs' works.

Robertson's appeal takes a kitchen-sink approach to attacking the judgment. But none of his objections has any merit. However, the District Court did err in ruling MP3tunes eligible for the Digital Millennium Copyright Act ("DMCA") safe harbor and in reducing the jury's damages award. Accordingly, the jury's original verdict should be reinstated and the matter remanded for further proceedings.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Plaintiffs' copyright claims under 28 U.S.C. §§ 1331 and 1338(a) and supplemental jurisdiction over Plaintiffs' state claims under 28 U.S.C. §§ 1338(b) and 1367.

Judgment was entered October 30, 2014. [D.E.636]. Robertson filed a Notice of Appeal on November 21, 2014, [D.E.658], and Plaintiffs filed a Notice of Cross-Appeal on December 4, 2014. [D.E.667]. The judgment was amended on April 14, 2015. [D.E.692]. Robertson and Plaintiffs filed Amended Notices of Appeal on April 24 and May 1, 2015, respectively. [D.E.693, 695].

2

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED ON ROBERTSON'S APPEAL

1.      Whether the District Court properly found personal jurisdiction based both on Robertson's personal infringing activity and the New York contacts of MP3tunes, which he owned and controlled.

2.      Whether the District Court properly sustained the verdict that MP3tunes had engaged in volitional conduct outside the scope of the DMCA safe harbor by copying cover art Plaintiffs had registered as works for hire.

3.      Whether the District Court properly instructed the jury on the elements of secondary liability and sustained the verdicts regarding the same.

4.      Whether the District Court properly sustained in part the verdict finding regarding willful blindness and red-flag knowledge.

5.      Whether the District Court properly sustained the verdict that certain infringements by MP3tunes executives had been within the scope of their employment.

6.      Whether the District Court properly considered the potential harm of Robertson's actions, and analogous penalties under state and federal law, in partially sustaining the punitive damages verdict.

7.      Whether the District Court properly sustained the verdict that certain sound recordings were exploited separately from any albums and accordingly treated as separate works for statutory damages purposes.

## ISSUES PRESENTED ON CROSS-APPEAL

1.      Whether the District Court erred in granting summary judgment on MP3tunes's claim that it reasonably implemented a repeat-infringer policy and thus was eligible for DMCA safe harbor protection.

2.      Whether the District Court erred in vacating the jury's verdict that MP3tunes was willfully blind to and had red-flag knowledge of the infringement of specific works, and thus was not protected by the DMCA with respect to such activity.

3.      Whether the District Court erred in holding that the DMCA safe harbor applied to infringements of sound recordings fixed before February 15, 1972.

4.      Whether the District Court erred by limiting Plaintiffs to a single statutory damages award when a copyrighted sound recording and a separate copyrighted musical composition owned by a different Plaintiff were infringed at the same time.

5.     Whether, if this Court reinstates the verdict with respect to certain state-law infringement claims, Plaintiffs are entitled to a remand on the issue of punitive damages.

## STATEMENT OF THE CASE

The Appellees/Cross-Appellants ("Plaintiffs") are record labels and music publishers who own or control the rights to some of the world's most recognizable and successful sound recordings and musical compositions.[1]  They sued Robertson and MP3tunes in 2007 to address rampant infringement of their works through MP3tunes's online services.[2]

Following a month-long trial, a jury in the Southern District found both Defendants liable for a wide range of willfully infringing activity, both direct (by Robertson, MP3tunes's executives, and MP3tunes) and vicarious and contributory (with respect to infringing copying by MP3tunes's users), and related state-law claims.  The jury also found Robertson—who founded, funded, indirectly owned, and thoroughly controlled MP3tunes—secondarily liable for most of the infringing activity.  (For the Court's convenience, Plaintiffs' specific claims are summarized in the "Summary of Claims and Dispositions" table attached to this brief.)

---

[1] This brief uses "Plaintiffs" throughout but refers to "Label Plaintiffs" and "Publishing Plaintiffs" separately as appropriate (*see* Corporate Disclosure Statement, *supra*).

[2]  For tactical reasons, Robertson put MP3tunes, which is not a party to this appeal, into bankruptcy in April 2012 shortly before the then-scheduled trial date.  [Tr.1714; D.E.298].

## A.     Robertson's Business Model for MP3tunes and Sideload.com.

Robertson's operation of his previous music site, MP3.com, resulted in a significant judgment for making unauthorized copies of copyrighted sound recordings. *See UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000). Robertson concededly created MP3tunes to finish the mission he started with MP3.com ("MP3.com guy back to rejuvenate MP3 business. Largest copyright infringer of all time at it again") and to create a music service to rival iTunes. [PX160, 484; Tr.955-60; 1045-53].

At the time Robertson launched the music services at issue here, he knew that the major record labels (including Label Plaintiffs), and their authorized retailers such as iTunes, distributed music digitally only in file formats that prevented further copying and distribution. [Tr.145-48, 1046, 1287-88; PX378 (Robertson admission that there had not previously been "licenses from major record labels to sell and deliver mp3 tracks"). However, he also knew that online infringement of copyrighted music in formats that permitted endless reproduction, such as the "MP3" format, was pervasive. [Tr.3130-32]. Therefore, Robertson devised a way to exploit the ubiquity of such infringement to attract subscribers to his commercial music business.

Robertson had his company MP3tunes create two online music services. First, he created a locker service ("MP3tunes.com"), which stored and streamed

music loaded by its users, as a free entry-level service with paid subscription tiers of storage. Second, he created a separate music download and streaming site, "Sideload.com," to attract users to the locker site. [Tr.278-81, 978-81]. Sideload.com operated an index of "free" music files that users could search, copy into MP3tunes lockers, and stream. Although the files accessible through Sideload.com remained hosted on third-party websites, users could copy them directly from Sideload.com. [Tr.291-92, 1010-11; DE276 at 3-4].

MP3tunes built Sideload.com's index by creating a software application, the "Sideload plug-in," that identified unprotected music files on any webpage the user visited and copied them instantly to users' lockers. It encouraged its users to use this software, and called the resulting unauthorized copying "sideloading." Whenever a user "sideloaded" music, the plug-in created a new entry in Sideload.com's index, thus publishing that file to subsequent Sideload.com users as well. [D.E.276 at 3-4; Tr.280-81]. When a user sideloaded music already in Sideload.com's index, the file's "sideload count" increased, enhancing its prominence on the site. [Tr.665]. Thus, the more users sideloaded, the more "free" music became available through Sideload.com, the more visible "popular" music became, and the more attractive Sideload.com became as an online destination for users to whom MP3tunes could sell its locker service.

Because major labels were not then distributing their popular music in file formats that allowed further copying (such as MP3), this business model played out as Robertson anticipated. Sideload.com rapidly was filled with infringing major-label music files, including thousands of Plaintiffs' works, hosted on third-party websites that had no conceivable authority to distribute them. [Tr.1488-89]. Plaintiffs' requests that MP3tunes take steps to address this systemic infringement were unsuccessful, as MP3tunes was unwilling to do more than remove individual files from Sideload.com when Plaintiffs identified the precise link. [D.E.276 at 5-6].

### B. Procedural History and Pretrial Rulings.

Plaintiffs sued Robertson and MP3tunes in 2007. [D.E.1]. As subsequently amended, the Complaint alleged federal and state copyright claims based on, among other things, unauthorized copying through Sideload.com and unlicensed streaming through MP3tunes's locker service. [D.E.91]. Plaintiffs later added claims related to MP3tunes's making and using unauthorized copies of Plaintiffs' album cover art. [D.E.121].

Robertson initially secured dismissal of the claims against him on personal jurisdiction grounds, based largely on false assertions minimizing his role in running MP3tunes. [D.E.48]. However, discovery later revealed that Robertson's control and management of MP3tunes was nearly absolute. [D.E.120 at 9-15;

8

D.E.629 at 7].  Based on these facts and evidence that MP3tunes did significant

business with New York subscribers, Robertson was reinstated as a defendant in

2009—a determination that he repeatedly and unsuccessfully sought to revisit.

[D.E.120 at 15-16; D.E.137; 368; 525].

Both parties cross-moved for summary judgment.  The District Court

granted Plaintiffs summary judgment as to direct infringement claims against

Robertson personally.   [D.E.276 at 33].  It also allowed Plaintiffs to proceed to

trial with other direct infringement claims, including copying by MP3tunes's

executives and MP3tunes's unauthorized use of album cover art.  [*Id.* at 30-32].

However, the District Court granted MP3tunes summary judgment that it

was eligible for safe harbor under the DMCA—holding, as a matter of law, that

MP3tunes had satisfied 17 U.S.C. § 512(i)(1)(A), which requires a service provider

to adopt and reasonably implement a policy for terminating repeat infringers.  [*Id.*

at 8-12].  It also held that this safe harbor barred Plaintiffs' state-law claims for

infringement of sound recordings fixed before February 15, 1972 and thus not

federally protected.  [*Id*. at 14-17].  The effect of these rulings was to bar almost all

of Plaintiffs' secondary infringement claims based on infringing activity by

MP3tunes's users, and to preclude Plaintiffs' direct infringement claims based on

MP3tunes's unauthorized public performance of Plaintiffs' works.

### C.   Reconsideration Order.

Following this Court's decision in *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), the District Court partially reconsidered its DMCA ruling.  Recognizing that *Viacom* required "explicit fact-finding" on those issues, it allowed Plaintiffs to pursue secondary infringement claims based on infringement by Sideload.com users to the extent Plaintiffs could show that MP3tunes was willfully blind to, or had red-flag knowledge of, such activity. [D.E.368 at 2-6].

### D.   Trial and Jury Verdict.

The case was tried before a jury for nearly one month, during which over twenty witnesses testified.  Plaintiffs' technical expert explained the features and operation of MP3tunes's system.  Plaintiffs' executives testified that MP3tunes was unauthorized to use their copyrighted works, and that MP3tunes's infringing activity harmed their businesses.  An Amazon.com representative testified that MP3tunes was not entitled to make its own copies of cover art from Amazon's servers.  Former MP3tunes employees testified regarding Robertson's control over the company; its policies and responses to known and suspected infringing activity; its awareness of infringing activity on Sideload.com; its business model; and their own use of the system to copy Plaintiffs' music.

Robertson himself testified three times.  Through this testimony, the jury assessed his credibility and learned of his history of exploiting online copyright infringement, his business model for MP3tunes, his control over every aspect of the company, his knowledge about the availability of infringing music on his websites, and the instructions he gave his employees regarding such music.

The jury found MP3tunes and Robertson liable for a wide range of direct and secondary infringing activity, itemized in the "summary of claims and dispositions" attached to the brief.  It also found that Defendants' infringing activity was willful and awarded statutory damages ranging from $15,000 to $100,000 per work.  With respect to Plaintiffs' state-law claims, the jury further awarded both nominal damages and $7.5 million in punitive damages.

The District Court limited these awards by ruling that Plaintiffs must share one statutory damage award where both a sound recording owned by Label Plaintiffs and a musical composition owned by Publishing Plaintiffs was infringed. [D.E.609].  Following that reduction, the jury's per-work damage awards resulted in a verdict against Robertson of $48,061,073 (and against MP3tunes for slightly less, with most of the liability joint).  [D.E.608, 608-1].

11

### E.     The JMOL Ruling.

After trial, Robertson moved to set aside virtually all of the jury's findings and damage determinations.  The District Court largely rejected these challenges in its Judgment as a Matter of Law ("JMOL").  [D.E.629 at 5-8, 16-26].[3]

However, the District Court significantly curtailed the jury's verdict with respect to secondary infringement claims based on infringing activity by MP3tunes users.  [*Id*. at 9-16].  On these claims, it sustained the jury's finding that MP3tunes was disqualified from DMCA protection with respect to files copied from third-party websites from which MP3tunes's executives had personally sideloaded infringing works.  [*Id*. at 14].   But it reversed the jury's findings  that MP3tunes was willfully blind or had red-flag knowledge regarding the remaining works.  [*Id*. at 11-16].

The District Court agreed that the evidence showed that Defendants knew that major record labels were not commercially distributing sound recordings in MP3 format before early 2007, and that such content was thus almost certain to be infringing.  [*Id*. at 12-13].  It nevertheless reversed the jury's finding of willful blindness as to Defendants' exploitation of  infringing MP3 files sideloaded during that period because it believed MP3tunes would have to "monitor" its service to

---

[3] The JMOL order also reversed the finding that MP3tunes had infringed the public display right in Plaintiffs' album cover art images.  [D.E.629 at 20].  However, this ruling was largely academic, as the order sustained the direct reproduction verdict involving the same images.  [*Id*. at 19-20].

remove them, an obligation the District Court believed inconsistent with the DMCA. [D.E.629 at 12-14]. The District Court also agreed that the evidence supported the jury's finding that Defendants knew they lacked authority to offer tracks by The Beatles—yet, with a handful of exceptions, it deemed the evidence insufficient to show that Defendants were aware they were offering such tracks. [*Id*. at 14-16].

The Court's earlier decision that state-law infringement claims were subject to the DMCA safe harbor reduced Plaintiffs' state-law infringement claims from 323 to only 31 works. [*Id*. at 41]. With respect to those 31, the District Court found that Robertson's conduct merited punitive damages, but remitted the award of $7.5 million to $750,000. [*Id*.].

The District Court entered Judgment (later amended) on October 30, 2014 for $12,241,531 against Robertson (and slightly less against MP3tunes). [D.E.636, 692]. These appeals followed.

## SUMMARY OF ARGUMENT

The jury should not have had to consider whether willful blindness or red-flag knowledge disqualified MP3tunes from DMCA protection. MP3tunes was never entitled to DMCA protection in the first place because it had no means of terminating or even identifying repeat infringers who used its public-facing Sideload.com website.

However, assuming the DMCA safe harbor *did* apply, the jury properly concluded that MP3tunes was both willfully blind to, and had red-flag knowledge of, specific groups of infringing files on its system.  The District Court's partial reversal of that finding was predicated upon a misreading of 17 U.S.C. § 512(m) that contravenes this Court's *Viacom* decision and would obviate the willful blindness doctrine under the DMCA.  As to the portion of the verdict the District Court sustained, the fact that MP3tunes's executives personally used specific sites to infringe was more than enough to support the verdict.

Further, even if MP3tunes *could* qualify for DMCA protection, 17 U.S.C. § 301(c) explicitly forecloses the argument that the DMCA preempts state-law claims involving sound recordings protected only by state law.

Notwithstanding Robertson's contrary arguments, personal jurisdiction was clearly established by his personal infringing conduct, which he knew would harm Plaintiffs in New York, and his personal control over MP3tunes, which did significant business with New York subscribers.  These same facts, coupled with Robertson's plan to profit from MP3tunes's user base attracted by the infringing activity, also supported the jury's determination that he was secondarily liable for both the infringing conduct by users and by MP3tunes itself.

As to the infringement claims involving conduct by MP3tunes executives (for which Robertson was held secondarily liable), the evidence supported the

14

jury's verdict that infringing activities by the executives were actions of the company.

With respect to the direct infringement claims involving cover art, Plaintiffs' copyright registrations proved their ownership of the cover art images at issue, and the trial record does not support Robertson's argument that MP3tunes's users, as opposed to MP3tunes itself, made the infringing copies.

Regarding statutory damages, the District Court erred in holding that Label Plaintiffs and Publishing Plaintiffs were not entitled to separate statutory damages awards where the former owned the sound recordings and the latter owned the separately copyrighted underlying musical compositions; both of which had been infringed. However, the District Court correctly sustained the award of separate statutory damages for each sound recording infringed, as Label Plaintiffs commercially exploited each separately.

Finally, Robertson's status as a wealthy repeat infringer who had been undeterred by past judgments, paired with the deceptive nature of his conduct and its potential harm to the entire music industry, amply supported the punitive damages award. Indeed, to the extent this Court reinstates Plaintiffs' wrongly-dismissed state-law claims, Plaintiffs are entitled to have the jury's original award restored.

15

# ARGUMENT

This Court reviews the District Court's grants of summary judgment (Issues I and III) and judgment as a matter of law (Issues II and V) *de novo*, construing the evidence in the light most favorable to the non-moving party. *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 320 (2d Cir. 2013); *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010). The Court also reviews *de novo* the eligibility of a work for statutory damages as a mixed question of law and fact under 17 U.S.C. § 504(c)(1) (Issue IV). *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 140 (2d Cir. 2010).[4]

## I. DMCA ISSUES.

### A. MP3tunes Was Ineligible for DMCA Protection Because It Failed to Establish that It Had a Reasonably Implemented Repeat-Infringer Policy.

To qualify for the DMCA safe harbor, a service provider must have "reasonably implemented" a policy for terminating "repeat infringers" in "appropriate circumstances." 17 U.S.C. § 512(i)(1)(A). The District Court granted summary judgment to MP3tunes, holding that it had satisfied this requirement, and denied Plaintiffs' corresponding cross-motion. [D.E.276 at 12]. This was error. MP3tunes did not put forth sufficient evidence to permit a jury finding that it had

---

[4] Because the appeal and cross-appeal involve many overlapping issues, Plaintiffs have grouped their arguments by topic rather than by the party appealing.

satisfied Section 512(i)(1)(A), much less establish the absence of a fact issue meriting summary judgment in its favor.

Because Sideload.com's purpose was to attract users by amassing and making available unauthorized music from all over the Internet, virtually all the music was infringing and virtually all of its users were repeat infringers.  Indeed, Robertson and MP3tunes's other executives were themselves unidentified and unpunished repeat infringers.  Thus, although MP3tunes's terms of use parroted the language of Section 512(i)(1)(A), [D.E.184-1], MP3tunes had no desire to identify (much less act against) repeat infringers who built the Sideload.com index and used it to fill their lockers, and did not do so.

       1.      <u>MP3tunes Failed to Connect Known Infringing Activity to Sideload.com Users.</u>

Although Section 512(i)(1)(A) prescribes no particular form for a repeat-infringer policy, there are at least two foundational requirements.  At minimum, a service provider must (a) independently maintain records of infringing activity, including activity identified through takedown notices, that it links to responsible subscribers; and (b) have an account termination process linked to infringement so identified.  *See, e.g.*, *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-cv-6646, 2015 WL 1402049, at *5-6 (S.D.N.Y. Mar. 25, 2015); *Disney Enters. v. Hotfile Corp.*, No. 11-20427-Civ, , at *21 (S.D. Fla. Aug. 28, 2013) (no safe harbor where service provider "effectively did nothing to tie notices to repeat infringers");

*see also Datatech Enters. Llc v. FF Magnat Ltd.*, No. C12-04500, 2013 WL 1007360, at \*5-6 (N.D. Cal. Mar. 13, 2013).

MP3tunes failed both of these requirements with respect to infringement on Sideload.com.  It received numerous DMCA takedown notices.  [D.E.276 at 5-6; Tr.1485-93].  But by its own admission, it made no effort to connect the infringements identified on those notices with the accounts responsible for either creating links to the infringing files in the Sideload.com index, or copying files from those links—even though it was able to do so.  [D.E.210, Ex.99 at 284, Ex.102 at 38; D.E.190-5 at 11-12, 46-46, 49; Tr.489:12-19; Horowitz  Decl. ¶¶54-55, 63-64, 70-72, Ex.O, P, S; Tr.489:6-20].

It is hardly surprising that MP3tunes made no such effort.  Doing so would have undercut Sideload.com's purpose and damaged the user base MP3tunes depended upon to populate its index.  Indeed, MP3tunes's own executives personally engaged in the sort of repeat infringement any reasonable policy would have identified.[5]  But without linking notices to users, MP3tunes could never learn of "appropriate circumstances" for termination, and thus could never identify or act upon repeat infringement.

---

[5] [Horowitz Decl. ¶¶72(iv)-(vii); 84(a-ee), Ex.W(i)-W(xi), X, Z].

18

This inaction was no academic matter, for repeat infringement on Sideload.com was pervasive.[6]  MP3tunes's inaction should have resulted in the loss of DMCA protection and the grant of Plaintiffs' cross-motion for summary judgment on this point.  A service provider that does not use takedown notices to identify infringing users has not "reasonably implemented" a repeat-infringer policy.  *See Hotfile*, 2013 WL 6336286, at *21-22; *Escape Media*, 2015 WL 1402049, at *12-13.  It has simply placed statutory buzzwords in its terms of use and then ignored them.

 2. The District Court Erred in Concluding that Tracking or Terminating Repeat Infringers Using Sideload.com Was Unnecessary.

The District Court exonerated MP3tunes from the statutory consequences of its inaction, reasoning that repeat infringers on Sideload.com did not merit termination because they could not "be certain whether content on third-party sites actually infringes."  [D.E.276 at 10-11].  This was error, as infringement does not depend upon intent.  "[C]opyright is a strict liability statute."  *Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 609 (S.D.N.Y. 2014).

Moreover, the purpose of Section 512(i)(1)(A) is not merely punitive, but also preventative: it prevents *future* infringement by warning and (if necessary)

---

[6] At least 688 users infringed recordings on at least two of Plaintiffs' takedown notices, and at least 139 infringed recordings on at least three.  [D.E.232 ¶¶95-96; Horowitz Decl. ¶¶71-72, Ex. S].  MP3tunes's same inaction persisted in the face of takedown notices from third parties. [Horowitz  Decl. ¶72(iii), Ex. S].

terminating the subscribers engaging in it. By doing nothing, MP3tunes ensured that such infringement continued unabated. Doing nothing cannot constitute reasonable implementation of a repeat-infringer policy, and "appropriate circumstances" for terminating accounts cannot mean "no circumstances."

Even if (as the District Court speculated) some users were unaware of the illegality of their conduct, a policy that notified users of takedown notices, and eventually terminated accounts if infringement persisted, would have addressed any such unawareness. Indeed, the DMCA directs service providers to provide such notifications. 17 U.S.C. § 512(g)(2)(A). Not doing so signals the absence of a reasonably implemented repeat-infringer policy. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1180 (C.D. Cal. 2002).

Although Robertson claimed that MP3tunes collected email addresses to "[w]arn[] users of improper use of its services," [D.E.184 ¶ 11], there was no evidence that it warned users regarding sideloads identified as infringing. Nor could MP3tunes have done so as it never even *identified* the responsible users.

The District Court also reasoned that users who used Sideload.com to make infringing copies were less deserving of termination because their conduct was not as bad as those who "posted" infringing files online in the first place. [D.E.276 at 638]. While this subjective ranking of degree of wrongdoing is irrelevant, it is also incorrect. Users who built the Sideload.com index by adding infringing links

thereby enabled infringement by subsequent users—just like users who had posted

infringing content to third-party websites.  [Tr.1010-11].  Moreover, the District

Court's reasoning would exempt every linking or indexing service provider from

the repeat-infringer policy requirement, a result incompatible with the statute.

> 3.  Terminating Users Who Shared Locker Passwords Did Not
>     Satisfy the Statute.

The District Court's summary judgment grant relied heavily on a declaration

from Robertson vaguely asserting that "MP3tunes has terminated the accounts of

users whom it has suspected of using MP3tunes's services for the purposes of

infringing activity," and attaching a list of 153 accounts supposedly terminated.

[D.E.184-4].  This declaration was inadequate and the District Court's reliance on

it to grant summary judgment to MP3tunes (and deny it to Plaintiffs) was error.

Robertson's declaration contained no description of how the users were

identified, nor the criteria for termination.  It thus provided no basis to conclude

that the terminations pertained to the implementation of a repeat-infringer policy,

much less a basis for evaluating any such policy or the reasonableness of its

implementation.  Mere evidence of terminations cannot satisfy a service provider's

burden of establishing reasonable implementation under Section 512(i)(1)(A).  *See*,

*e.g.*, *Hotfile*, 2013 WL 6336286, at *9 (denying safe harbor where service provider

failed to "explain the conditions that led it to target or terminate users.").  And

even if this declaration had been enough to convince a jury (which it was not), it

was certainly not sufficient to *compel* a conclusion that MP3tunes had satisfied Section 512(a)(1)(A).

Moreover, the vagueness of Robertson's declaration was intentional, disguising the fact that the relevant accounts were *not* terminated for repeat infringement via Sideload.com. As Robertson testified, they were terminated for sharing passwords to their MP3tunes lockers. [Tr.2067-68; D.E.210, Ex.99 at 193-94; D.E.190-2 at 195]. Prohibiting account-sharing may have been a sensible business policy to promote the sale of more locker subscriptions. Yet even if one were to characterize password-sharing as a type of copyright infringement, any policy that addressed account-sharing but not the public-facing infringement that MP3tunes encouraged via Sideload.com could not bring MP3tunes within the safe harbor: it failed to address the source of infringing files available for public download, and failed to consider known infringement identified via takedown notices. *See*, *e.g.*, *Hotfile*, 2013 WL 6336286, at *22 (denying safe harbor where service provider's terminations "had no apparent relation to the notices Hotfile received.").

Because Robertson's summary judgment declaration did not even raise a fact question regarding whether MP3tunes had "reasonably implemented" a repeat infringer policy, the District Court erred by granting summary judgment to MP3tunes, and not to Plaintiffs.

22

### 4. The Repeat-Infringer Holding Deprived Plaintiffs of Significant Claims.

The erroneous grant of summary judgment to MP3tunes on the repeat-infringer issue significantly and wrongfully restricted Plaintiffs' claims.

First, it artificially limited Plaintiffs' claims predicated upon users' infringing copying to only such activity as to which MP3tunes was disqualified from DMCA safe harbor by willful blindness or red-flag knowledge. Absent the safe harbor, Plaintiffs would have been entitled to prove more broadly that MP3tunes was vicariously or contributorily liable for such activity. *See* Part II.B, *infra*.[7]

Second, it eliminated Plaintiffs' claim that MP3tunes had illegally publicly performed thousands of Plaintiffs' works to MP3tunes locker subscribers. [D.E.276 at 24; D.E.121 ¶42]. The Supreme Court recently affirmed in *ABC v. Aereo, Inc.*, 134 S. Ct. 2498, 2506 (2014), that the transmission of copyrighted works over the Internet to large groups of subscribers can constitute a public performance, bolstering Plaintiffs' claim that MP3tunes's unlicensed use of Plaintiffs' works as part of its music business supported such a claim here. However, the District Court granted summary judgment under the DMCA, reasoning that MP3tunes's music streaming "utilizes automatic and passive

---

[7] For that reason, if the Court concurs that MP3tunes's summary judgment motion should have been denied and Plaintiffs' granted, it is not necessary to reach the question presented in Part I.B—whether the jury properly rejected the DMCA defense. Absent a DMCA defense, the jury's finding that Defendants were vicarious and contributory infringers would control.

software to play back content stored at the direction of users," and was thus

protected under Section 512(c). [D.E.276 at 31]. This holding depended upon the

District Court's erroneous determination that MP3tunes was entitled to the DMCA

safe harbor. It therefore should likewise be vacated and the public performance

claim remanded for further consideration—particularly given that the Supreme

Court has since provided additional guidance in this precise area.[8]

### B. The Jury Properly Found MP3tunes Disqualified from DMCA Protection with Respect to Numerous Infringements by Its Users.

For the reasons stated in Part I *supra*, MP3tunes should not have been

entitled to assert the DMCA safe harbor at all. Nonetheless, the jury rejected this

defense. After an extensive four-week trial and careful consideration of the

evidence and witness credibility, it found that MP3tunes was ineligible for the safe

harbor with respect to specific user-infringed works because MP3tunes both was

willfully blind to, and had red-flag knowledge of, those infringements. The

District Court properly sustained a portion of this verdict, but erred in vacating

substantial portions of it.[9]

---

[8] Because the summary judgment grant preceded *Aereo*, the parties expended considerable effort below debating whether MP3tunes used a single or multiple server copies of music files to effect streaming, a factor considered relevant in some pre-*Aereo* caselaw. [D.E.276 at 2-3]. However, the District Court's judgment was ultimately based on Section 512(c) of the DMCA, and *Aereo* has since clarified that whether one "transmits from the same or separate copies" is not relevant to the public performance inquiry. 134 S. Ct. at 2509.

[9] Because Robertson was held secondarily liable for the infringing actions by MP3tunes and its users, he benefited from this improper grant of JMOL.

1.    <u>Substantial Evidence Supported the Willful Blindness Verdict.</u>

The DMCA safe harbor is unavailable to service providers that are "aware of a high probability of" particular infringing activity "and consciously avoid[] confirming that fact." *Viacom*, 676 F.3d at 35 (quotation marks omitted). The willful blindness inquiry is thus inherently factual. *Id*. at 35 & n.10.

This was the first jury trial conducted under *Viacom*. And the jury engaged in the precise factual inquiry this Court directed. Over the extensive course of the trial, it heard evidence establishing that MP3tunes "had reason to suspect specific instances of infringement by its users" and "consciously or deliberately avoided confirming that suspicion, or shielded itself from learning of the particular infringing transactions by looking the other way." [D.E.613-1 at 27]. The jury's determination that MP3tunes was willfully blind followed this Court's direction in *Viacom*, was amply supported by the evidence, and should not have been disturbed.

    a.  *The Specific Factual Context of MP3tunes's Operations Informed and Supported the Jury's Findings*.

Two characteristics of MP3tunes' operations and business model informed the jury's conclusions. First, unlike general-purpose sites (like YouTube), Sideload.com was dedicated exclusively to reproducing and performing digital music files. Robertson knew that illegal copies of such files were pervasively available on the Internet at all relevant times. [Tr.3130-31]. Indeed, Robertson

25

conceded that Sideload.com was "premised on the notion that everything that was on the internet that was not locked down could be sideloaded into the site." [Tr.2065]. Accordingly, Robertson created Sideload.com for the *exclusive* purpose of making available a specific category of files as to which the risk of infringement was known to be extremely high. The business purpose of Sideload.com was clear: to use those infringing commercial sound recordings to attract users to MP3tunes's paying locker service. [Tr.981-84; PX313, 404].

Second, because MP3tunes was in the business of making desirable music available, it collected and used detailed information about the music on Sideload.com. MP3tunes maintained and displayed searchable data identifying the artist and track for each file on Sideload.com, [Tr.302-03; PX136], and further deployed "audio fingerprinting" software to identify files lacking such information. [Tr.310-12]. Indeed, that software also provided information on the track's copyright owners. [*Id*.] MP3tunes's employees monitored and reported on which songs were available through Sideload.com and which sites hosted the underlying files. *See, e.g.*, [Tr.1020-23; PX96, 100, 117, 296, 303]. These facts left no doubt that MP3tunes was aware of, and in fact intended, the infringement that was rampant on Sideload.com—severely undercutting any claim that MP3tunes was *not* willfully blind to particularized acts of infringement. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020,1040 (9th Cir. 2013) (although "[i]t is …

26

conceivable that a service provider" liable for intentional contributory infringement could be entitled to safe-harbor protection, "aspects of the inducing behavior that give rise to liability are relevant to the operation of some of the DMCA safe harbors and can, in some circumstances, preclude their application.").

      b. *Awareness of High Likelihood of Specific Infringing Activity*.

Against this backdrop, the jury heard evidence that there were certain known, discrete groupings of songs on Sideload.com as to which Defendants were "aware of a high probability" of infringement.

First, the District Court agreed that "the jury heard evidence from which it could conclude Defendants were aware that major record labels had not offered MP3s until 2007." [D.E.629 at 13]. At that time, they still used protected file formats that prevented further copying and thus further distribution. Thus, the presence of major-label content in the unprotected MP3 format was a clear indication of unauthorized copying. [Tr.1501-03]. As the District Court further agreed, the evidence supported the jury's finding that Robertson, as a knowledgeable "industry insider[]," "knew" this. [D.E.629 at 13]. In January 2007 he even conceded that "*popular acts have never before sold tracks in MP3 formats*." [PX378 (emphasis added)].

Robertson devoted significant portions of the trial to an unsuccessful effort to limit that critical admission, arguing that Label Plaintiffs "gave away" music in

MP3 format and thereby gave MP3tunes a plausible expectation that some major-label music was legitimately available for free distribution while MP3tunes was exploiting it. However, Robertson failed to support this theory with persuasive evidence, and both the jury and the District Court rejected it.[10]

Second, similar circumstances existed with respect to recordings by The Beatles. Here, again, the District Court agreed that the evidence proved "that MP3tunes was aware of facts that would indicate to a reasonable person that sideloading any Beatles song before 2010 was an act of infringement." [D.E.629 at 15]. Robertson himself admitted that he was not aware of *any* legitimate online distribution of Beatles tracks before 2010, other than one track used within a video game. [Tr.1042-43, 1918]. And he admitted authoring a 2009 e-mail in which he stated that he was aware of Label Plaintiffs' position that "[The] Beatles have never authorized their songs to be available digitally." [PX383].

Third, the evidence demonstrated that Robertson and MP3tunes were aware that "personal" sites on file-storage services, and student webpages on college websites, were both sources of infringing files available through the Sideload.com index. [Tr.1284-85, 2162]. Robertson even sideloaded from personal websites

---

[10] Robertson pointed to evidence showing that Plaintiffs authorized the South by Southwest music festival to use MP3 files. [Tr.1501-03]. He also presented unauthenticated screenshots purporting to show that some MP3s were available on Amazon.com. [DX2338]. But that proved at most that Plaintiffs authorized specific partner sites to distribute limited MP3 files, not that the music was freely available to be further copied by anyone, or offered through Sideload.com.

himself.  [Tr.2120-22].  Knowing "the identity of the sellers behind" infringing listings (*i.e.*, those without authorization to distribute protected material) can supply awareness of infringement just as much as "the offending listings" themselves.  *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109 (2d Cir. 2010).  It was perfectly reasonable for the jury to conclude—as it did—that when MP3tunes's executives *personally* engaged in infringing activity involving *specific* personal webpages or college websites, MP3tunes thereby (1) acquired knowledge that those specific personal and college student websites were offering infringing files through Sideload.com, and (2) became aware of a high likelihood that files from those specific sites available on Sideload.com were infringing, but (3) consciously chose not to confirm such suspicion.

      c.  *Conscious Avoidance of Knowledge as to Specific Details of Infringement*.

The jury also had before it powerful evidence that MP3tunes "consciously avoided confirming" suspicions as to the specific infringing activity in both categories above.  Critically, the jury heard that Robertson established policies to ensure that MP3tunes would *never* confirm any such suspicions, directing that "we do not remove songs unless we are presented with a DMCA compliant request to do so."  [PX253; Tr.1039].  Indeed, Robertson admitted that MP3tunes took no steps to determine whether it had authorization to offer *any* of the music available through Sideload.com for public copying.  [Tr.1032].  The evidence showed that

29

MP3tunes affirmatively set policies to avoid the acquisition of confirming knowledge because of its business reliance on infringing content and its erroneous view that its DMCA obligations were limited solely to responding to takedown notices.

MP3tunes's corporate policy of *never* confirming suspected infringement contrasts sharply with its conceded gathering and use of specific identifying information about music available on its service for its own business purposes. Among other things, MP3tunes stored artist and track information for each file so that users could locate specific songs. [Tr.270]. Further, MP3tunes used content identification software to identify artist and track information for files lacking such information. That software provided MP3tunes with information about the copyright ownership of each of the recordings. [PX136; Tr.311-12]. However, since MP3tunes's business was premised on the use of infringing material, it simply discarded this portion of the reports. [Tr.487-88].[11]

---

[11] YouTube, the defendant in *Viacom*, had access to similar software, but used it only to identify the ownership of works of business partners, not of other copyright owners. *See Viacom*, 676 F.3d at 40. Presumably, YouTube did so to avoid acquiring knowledge of specific files that would disqualify it from DMCA protection. MP3tunes used identifying information from the software for its own benefit, but then deliberately discarded the portions of the information that could confirm suspected infringement.

2. <u>The District Court's Interpretation of Section 512(m) Was Erroneous and, if Accepted, Would Swallow the Willful Blindness Doctrine.</u>

Despite the ample evidence supporting the jury's verdict, the District Court set it aside with respect to Plaintiffs' music distributed in MP3 format before early 2007. It concluded that even though MP3tunes was aware of the high likelihood of infringement of such files and avoided confirming that knowledge, imputing knowledge to MP3tunes via willful blindness would "impose an obligation to affirmatively monitor content" inconsistent with Section 512(m) of the DMCA. [D.E.629 at 12]. That holding was error.

The District Court's reasoning would eviscerate the doctrine of willful blindness. By definition, a service provider that has "shield[ed] itself from learning of the particular infringing transactions by looking the other way" has deprived itself of some information necessary to identify the specific locations of infringing materials on its service. *Viacom*, 676 F.3d at 35 (quoting *Tiffany*, 600 F.3d at 109). For that very reason, such a provider would need to engage in remedial action, including consulting the information ignored or deliberately not obtained, in order to identify those locations.

Put differently, awareness of a high likelihood of specific infringing activity creates a duty to engage in some remedial investigation. In *Tiffany*, this Court approvingly quoted the Seventh Circuit's statement that "[t]o be willfully blind, a

31

person must suspect wrongdoing and deliberately *fail to investigate*." *Tiffany*, 600 F.3d at 109 (quoting *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir. 1992) (emphasis added)). These and other appellate cases make clear that deliberately avoiding guilty knowledge (*i.e.*, willful blindness) includes consciously refusing to take "basic investigatory steps" or "make further inquiries" when faced with a high likelihood of wrongdoing. *E.g.*, *United States v. Appolon*, 695 F.3d 44, 57 (1st Cir. 2012) (quotation marks omitted); *United States v. Butler*, 646 F.3d 1038, 1041 (8th Cir. 2011). Thus, while Section 512(m) frees service providers from any obligation to proactively look for copyrighted materials on their systems, neither Congress nor the *Viacom* panel intended that section to provide service providers with an excuse for failing to investigate once aware of a high likelihood of specific infringements.

The District Court's conflation of a service provider's obligations to investigate suspected specific infringing activity with the sort of proactive "monitoring" obligation disclaimed by Section 512(m) was particularly inappropriate in this case because MP3tunes was already compiling information that identified the *specific* locations of the infringing activity for other business purposes. Thus, MP3tunes did not need to "affirmatively monitor" content in order to identify music files in either category as to which the District Court granted JMOL. MP3tunes *already* indexed Beatles tracks and had data showing

32

which files were MP3s and when they were uploaded (*i.e.*, the data showed whether an MP3 file was uploaded prior to 2007). [Tr.446-48]. Popular music from commercial labels is recognizable to persons knowledgeable about the music industry, like people creating and monitoring music sites. And to the extent MP3tunes might have needed additional information to confirm ownership of less-recognizable works, its content identification software was *already* providing it with such information. MP3tunes was simply discarding it. [Tr.311-12].

Confirming the specific infringing files in both categories of suspected infringing activity, therefore, would have required only that MP3tunes consider information already in its possession. These are the "basic investigatory steps" required to avoid a finding of willful blindness, *Appolon*, 695 F.3d at 57 (quotation marks omitted), not the "affirmative" or "broad common law duty to monitor" that *Viacom* disavows. 676 F.3d at 35. Imputation of specific knowledge in such circumstances arises from the law's longstanding recognition that one cannot escape legal consequences by consciously avoiding guilty knowledge.

3.   The District Court Wrongly Dismissed Evidence of
     Infringement of The Beatles Tracks as Insufficiently Specific.

The District Court also reversed the jury's verdict with respect to Beatles tracks on a different ground: its belief that there was insufficient evidence that MP3tunes was aware that Sideload.com was making *specific* Beatles tracks

33

available (other than those copied by its executives and one single track of which it was separately notified). [D.E.629 at 14-16]. This holding was also error.

Knowing of *specific* infringing files constitutes *actual* knowledge under Section 512(c)(1)(A)(i). However such "specific" knowledge is precisely what a willfully blind provider has avoided. *Viacom* contemplates that a provider may become aware of infringement with respect to a discrete group of files while avoiding "learning of the *particular infringing transactions* by looking the other way." *Viacom*, 676 F.3d at 35 (quoting *Tiffany*, 600 F.3d at 109) (emphasis added); *see also Tiffany*, 600 F.3d at 109 (defendant could be charged with knowledge if after suspecting infringement it "intentionally shielded itself from discovering the offending listings …"). Indeed, *Viacom* found an issue of fact regarding such awareness in the context of "groups of clips" where the evidence showed that YouTube was aware of a discrete *category* of infringing activity—specifically, footage of Premier League soccer games retrievable via "searches" of its index. 676 F.3d at 33.

The relevant question is whether MP3tunes was aware of a "high probability" that it was offering unauthorized tracks by The Beatles through Sideload.com—a proposition abundantly supported. MP3tunes recorded the artist and track name of every music file on its service, meaning that works by The Beatles were openly labeled as such in MP3tunes's database. [Tr.443, 446, 1042,

1972-74; PX397].  Moreover, MP3tunes's executives were sideloading Beatles tracks themselves.  [PX449; Tr.372-73, 673-74].  The jury was entitled to make the obvious inference that as part of that process MP3tunes's executives searched Sideload.com for music by The Beatles—a search that would have made them aware of all of the Beatles works in MP3tunes's index, not just the specific ones they chose to copy.

> 4. The District Court Correctly Sustained the Secondary Infringement Verdict With Respect to Sites Used by MP3tunes Executives to Infringe Personally.

The District Court  correctly sustained the verdict with respect to one group of files: those originating from specific websites that MP3tunes knew had no authority to distribute them because MP3tunes's executives had *themselves* copied infringing files from those sites.  [D.E.629 at 14].

Robertson argues that the evidence of MP3tunes's awareness of infringements on those sites was insufficiently specific to tie it to the files at issue. Robertson's Brief  ("Br.") at 46-51.  But his focus on the sufficiency of individual pieces of evidence ignores the totality of the circumstances.  Where a service provider knows that a host site offers unauthorized files, yet links to files on that host anyway, DMCA disqualification of the service provider is consistent with the intent of Congress—which specifically called out Internet "directories" that link to known, unauthorized online locations as ineligible for DMCA protection.  [S. Rep.

35

No. 105-190 at 48 (1998)].  And as discussed *supra*, *Viacom* likewise contemplates that a service provider can acquire disqualifying knowledge of infringement for "groups" of files in the aggregate.  *Viacom*, 676 F.3d at 33.

In this case, MP3tunes tracked the website from which every music file on Sideload.com originated.  [Tr.1020-23, 1032-33; PX96, 100, 117, 296, 303].  Thus, once MP3tunes knew that particular host sites had no authority to distribute commercial music—or at least became aware of a high likelihood that Sideload.com was offering infringing files from those sites—no further "investigation" was needed to identify the specific files Sideload.com was making available from those sites.

Robertson gains no ground by arguing that the personal file-storage and college student websites with respect to which the jury found MP3tunes ineligible for DMCA protection were "not obvious pirate sites" and that "nothing on" the specific pages at issue "would make it objectively obvious that they host infringing music."  Br. at 49-50.  Whatever his lawyers may now argue on appeal, the evidence at trial showed that Robertson and MP3tunes knew and believed that personal file storage sites and college student webpages were distributing infringing files.  [Tr.1284-85, 2120-22, 2162].  Robertson even claimed at trial that MP3tunes eventually cut off one of the websites at issue for that exact reason.  Br. 52 n.5.  Moreover, the evidence showed that MP3tunes knew that the *specific* sites

36

at issue hosted infringing music, for MP3tunes's executives *personally copied infringing files from those specific sites*. [Tr.606; PX448]. Short of Robertson personally infringing each and every file at issue, it is difficult to imagine how the company's knowledge of the sites' unauthorized nature could be any more specific.

This leaves only Robertson's argument that since MP3tunes's records showed that many of the infringing files copied by the executives were available via links on other websites ("referrer" sites) and through Sideload.com's index itself, MP3tunes's executives might not have, in every instance, personally navigated to the source sites containing the files and viewed their contents. Br. 51. But this argument is a red herring. The jury heard evidence (cited by the District Court in sustaining the jury's verdict) that where an intermediate "referrer" site linked to a music file stored on a different "host" site, Sideload.com made both the "host" and the "referrer" site known to the person doing the copying. [Tr.296-300, 355-60, 451-56]. Moreover, although navigating a web browser to a personal or college student website is one way that an MP3tunes executive might become aware that a site is offering commercial music without authorization, copying an infringing file from the same website via an intermediary link or the Sideload.com index can supply the same awareness. Indeed, the jury heard evidence (already known to anyone who has used the Internet) that links often point to other websites

37

and that people using such links can see the location of those websites. [Tr.295-97, 2839-40]. Given the evidence that MP3tunes was already aware of unauthorized files' availability from personal sites and college websites, an executive's copying infringing files from such a site is more than enough to sustain a jury's finding that the company was aware of it, whether that copying happened directly or through a link.

5. The Identifiability of the Infringing Files Also Supported the Jury's Red Flag Knowledge Verdict.

Since reinstatement of the jury's willful blindness finding will disqualify MP3tunes from the DMCA safe harbor for the works at issue on those claims, this Court need not reach the question of whether MP3tunes was independently disqualified from DMCA protection for the same works under the "red flag" provisions of Sections 512(c)(1)(A)(ii) and (d)(1)(B). Here, again, the jury found (based on the same evidence detailed above) that MP3tunes had "knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement" that will likewise "disqualify a service provider from the safe harbor." *Viacom*, 676 F.3d at 32. To the extent this Court reaches that issue, it should reinstate the jury's verdict here as well.

*Viacom* specifically contemplates that a service provider can acquire "knowledge or awareness" of "specific and identifiable" infringements on an aggregate basis. 676 F.3d at 33. *Viacom* found that the plaintiffs had raised a fact

question regarding the defendant's knowledge or awareness of specific "groups of clips" defined by shared characteristics (*e.g.*, Premier League soccer videos available through YouTube's search index). *Id.* Critically, although the "red flag" standard ultimately requires proof that the defendant had objective awareness of specific infringing activity, it does not dictate that the evidence supplying such "awareness" identify each infringement separately.

Here, as discussed above, both groups of infringing files as to which the District Court reversed the jury's red-flag knowledge verdict (major-label content in MP3 format prior to early 2007 and Beatles tracks) comprised music files that were itemized and identified separately in data that MP3tunes collected for business purposes. Thus, because MP3tunes already knew which individual files comprised each grouping, knowledge of facts or circumstances that the *categories* were infringing was sufficient to support the jury's verdict that MP3tunes had red-flag knowledge as to the identifiable files *within* those categories. The red-flag knowledge verdict, therefore, should have been left undisturbed.

### C. It Was Error to Apply the DMCA to Infringement of Pre-1972 Sound Recordings.

The District Court also erred in holding that the DMCA limits liability for state-law claims arising from infringement of sound recordings fixed prior to

February 15, 1972, which are not federally copyrightable.[12]  This result is contrary to the plain text of the Copyright Act.

The Copyright Act states that "[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State *shall not be annulled or limited by this title* until February 15, 2067." 17 U.S.C. § 301(c) (emphasis added).  Thus, the Act neither protects pre-1972 sound recordings nor interferes with state-law protections for such recordings.  *See* Act of Oct. 15, 1971, Pub. L. No. 92-140, 85 Stat. 391, 392; *see also Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 478 (2d Cir. 2004) ("[I]t is entirely up to New York to determine the scope of its common law copyright with respect to pre-1972 sound recordings.").

The DMCA is part of "this title" (*i.e.*, Title 17) and hence is subject to the express limitation on preemption contained in Section 301(c).  Accordingly, the DMCA cannot limit state claims.  *See UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 964 N.Y.S.2d 106 (App. Div. 2013).  As the Copyright Office has noted, "it is for Congress, not the Courts, to extend the Copyright Act to pre-1972 sound recordings, both with respect to the rights granted under the Act *and the limitations on those rights.*"  U.S. Copyright Office, *Federal Copyright Protection*

---

[12] This same question is also under consideration in *Capitol Records, LLC v. Vimeo, LLC*, Nos. 14-1048, 14-1049 (2d Cir. filed Apr. 9, 2014), scheduled for argument Nov. 6, 2015.  Plaintiffs expect that the Court's decision in *Vimeo*, if it precedes a decision in this case, will control the result here.

*For Pre-1972 Sound Recordings: A Report of the Register of Copyrights* 132 (2011) (emphasis added).[13]

The District Court thus erred in concluding that the DMCA's protection against liability for "infringement of copyright" was broad enough to encompass state-law claims. Moreover, even apart from Section 301, that reading does not square with other unambiguous language in the Copyright Act. The DMCA applies to liability for "infringement of copyright," which Section 501(a) defines as comprising claims arising under the Copyright Act itself ("any of the exclusive rights of the copyright owner as provided in sections 106 through 122"), not claims under state law pertaining to works not federally protected.

## II.   ROBERTSON'S  PERSONAL LIABILITY ISSUES.

### A.    Robertson is Subject to this Court's Jurisdiction.

Robertson challenged the District Court's personal jurisdiction over him on six separate occasions after being reinstated as a defendant. The District Court properly rejected his challenge each time. [D.E.120, 137, 318, 368, 525, 643]. In support of its rulings, the District Court ultimately found the following facts:

- As CEO and *de facto* owner (through family trusts) of MP3tunes, Robertson extensively controlled all aspects of MP3tunes's business. [D.E.318 at 6-7].

- MP3tunes, under Robertson's direct supervision and control, sold

---

[13] Available at http://www.copyright.gov/docs/sound/pre-72-report.pdf.

subscriptions to users in New York and thus derived substantial revenues from doing business in New York. More generally, a significant portion of MP3tunes's users were located in New York. [D.E.48 at 2; D.E.318 at 6].

- Robertson personally infringed Plaintiffs' copyrights, including by sideloading copyrighted works from third-party websites, which in multiple instances also had the effect of publishing those infringing files to the Sideload.com index for further copying by MP3tunes's users. [D.E.318 at 3-4].

- Robertson knew that Plaintiffs were located in New York and owned the works he infringed. Indeed, his previous company, MP3.com, had previously been sued in New York by the four largest record labels. [*Id*. at 5-6]. As such, Robertson expected or should reasonably have expected his infringing acts to have consequences in New York. [*Id*.].

These facts were supported by overwhelming evidence and were not meaningfully disputed, as the District Court twice found. [D.E.318 at 3-7; D.E.368 at 14-15]. Nor does Robertson dispute them on appeal.[14] Based on these and other facts, the District Court correctly concluded that personal jurisdiction over Robertson comported with both New York's long-arm statute and due process.

---

[14] The undisputed nature of the pertinent jurisdictional facts, none of which Robertson questions on appeal, disposes of his argument that the District Court should have held an evidentiary hearing. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).

[D.E.318; 368].  Robertson does not dispute the holding under New York's long-arm statute, instead arguing only that he lacked "minimum contacts" with New York.  The Court should reject his challenge.

### 1.    Robertson's Contacts With New York Satisfied Due Process.

"[M]inimum contacts exist where the defendant purposefully availed itself of the privileges of doing business in the forum and could foresee being haled into court there."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quotation marks omitted).  Judged by this standard, the exercise of personal jurisdiction over Robertson easily passes muster.[15]

*First*, as the District Court explained, MP3tunes did a significant amount of business with New York customers.  [D.E.48 at 2; D.E.120 at 15].  Since Robertson exercised extensive control over MP3tunes, the District Court found, it was appropriate to impute MP3tunes's contacts with New York to Robertson. [D.E.318 at 7, *citing Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988)].  The District Court based its finding on overwhelming, undisputed evidence that Robertson exercised total control over MP3tunes's day-to-day activities, including full control over the policies that drove the infringing activities that ultimately harmed Plaintiffs in New York.  [D.E.293: Ex.3 at 71-74; Ex.4 at 24, 34 (Robertson "pretty much directed all the technical things" at MP3tunes), 35,

---

[15] Personal jurisdiction may be general or specific.  The District Court's rulings here pertained to Robertson's actions forming the basis for his liability, and thus sounded in specific jurisdiction. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 n.6 (2d Cir. 2013).

38-42; Ex.6 at 19-20; Ex.9 at 27-33, 61-65; Ex.10 at 15-18, 49 ("no one made any

final decisions other than Michael"), 53; Ex.11 at 98-102; Exs.12-14, 18-20, 23-24,

31-38; Ex.39 ¶11;Ex.48-51].  Robertson's brief all but ignores the overwhelming

evidence of his control over MP3tunes.  Yet that control made it proper to impute

MP3tunes's contacts with New York to Robertson.  *See Retail Software*, 854 F.2d

at 22; *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (employees who direct

tortious conduct to a particular state and against parties located in that state are

subject to suit in that state).

  *Second*, even without imputing MP3tunes's contacts to Robertson,

Robertson's personal infringing activities are sufficient to establish minimum

contacts with New York.  The District Court held Robertson liable for personally

sideloading multiple works.  [D.E.368 at 15].  Robertson was fully aware that these

works were owned by corporations located in New York as he had both litigated

with them in New York previously and received takedown notices from Plaintiffs'

counsel in New York (yet continued to personally sideload Plaintiffs' works).

[D.E.318 at 5-6; PX23, 28, 375b-d].  Further, Robertson frequently monitored

visitors and sales for MP3tunes, [D.E.293, Ex.5 at 53-55, Ex.26-28].  As a result,

he knew that his personal sideloading published infringing materials to

Sideload.com for users, including users in New York.  [D.E.318 at 4-6].  These

activities are more than sufficient to establish "minimum contacts" such that

Robertson could reasonably expect to be sued in New York.  *See Calder*, 465 U.S. at 789-90; *Eades v. Kennedy, PC Law Offices*, No. 14-104-cv, -- F.3d --, 2015 WL 3498784, at *3-4 (2d Cir. June 4, 2015); *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171-72 (2d Cir. 2010) (making infringing products available to New York customers via website).

> ### 2.    <u>*Walden v. Fiore* Does Not Counsel a Different Conclusion.</u>

Robertson's brief virtually ignores this analysis and instead relies on a misinterpretation of the Supreme Court's decision in *Walden v. Fiore*, 134 S. Ct. 1115 (2014).

In *Walden*, the defendant had no independent contact with the forum state (Nevada) and the tortious injury itself had no connection to the forum state.  The allegation of jurisdiction was based solely on defendant's interaction with the Nevada-resident plaintiffs—an interaction that took place when both the defendant and the plaintiffs were in Georgia.  Thus, *Walden* holds only that a plaintiff's contacts may not be the *sole* link between the defendant and the forum.  *See C.W. Downer & Co. v. Bioriginal Food & Science Corp.*, 771 F.3d 59, 67-68 (1st Cir. 2014) (interpreting *Walden*).

This case is dramatically different, as Robertson's contacts with New York were far more substantial.  He controlled MP3tunes, which did a substantial amount of business in New York—which is enough on its own.  *Licci*, 732 F.3d at

172-73.  Moreover, the effects of Robertson's infringing conduct in New York were far more substantial than those in *Walden*.  Robertson *willfully* infringed the copyrights of companies that he knew were located in New York, both personally (through his own sideloading) and secondarily (through his company).  The District Court duly took note of these facts in rejecting Robertson's reliance on *Walden*.  [Tr.326-27].

*Walden* also expressly limited its holding, explaining that "this case does not present the very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State."  *Walden*, 134 S. Ct. at 1125 n.9.  *Walden* therefore expressly "le[ft] questions about virtual contacts for another day."  *Id*.  *Walden* therefore has no bearing here.

Those courts that *have* addressed "virtual" contacts—including this Court—have made clear that, where a corporation does business over the Internet with a forum state's residents, it is subject to suit in that state, even if the corporation's website has a national reach.  Those same cases regularly impute to an individual defendant the corporation's operation of such a website.[16]  *See e.g., Chloe*, 616 F.3d at 171-72; *Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S. Org., LLC*, 875 F. Supp. 2d 211, 221-23 (W.D.N.Y. 2012).  The same result is warranted here.

---

[16] Robertson is wrong to claim that New York residents must have been singled out by MP3tunes to create minimum contacts.  *See Calder*, 465 U.S. at 789-90 (injury is directed to California when publisher is aware of large circulation in that state); *Mrs. U.S. Nat'l Pageant, Inc.*, 875 F. Supp. 2d at 222 (defendants need not "single[] out" New York).

46

**B.**     **The District Court Properly Sustained the Jury's Secondary Liability Verdict.**

The jury held that Robertson was both vicariously and contributorily liable for the infringing actions of MP3tunes (and some of its subscribers). Both verdicts were amply supported by the evidence, based on proper instructions, and properly sustained.

### 1.     Robertson Was a Classic Vicarious Infringer.

Robertson was liable for vicarious infringement because he had "the right and ability to supervise the infringing activity and also ha[d] a direct financial interest in such activities." *Gershwin Publ'g Corp. v. Columbia Artist Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Robertson does not even bother disputing his right and ability to control the infringing activity. Nor could he, given the overwhelming evidence of his micromanagement of virtually every aspect of MP3tunes's operations. *See* Part II.B, *infra*. His appeal rests entirely on a flawed challenge to his financial interest in the infringement—which the District Court rightly rejected.

#### a.  *The District Court Correctly Instructed the Jury.*

The Ninth Circuit's decision in *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) held that in the context of online services, infringing material that attracts users can establish the "direct financial benefit" prong of the vicarious liability standard, expressly rejecting the district court's requirement that a

47

"substantial portion of a defendant's income . . . be directly linked to infringing activities." *Id*. *Ellison* has been consistently followed, including in this Circuit. *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) ("to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant, draw—rather, it need only be 'a' draw."); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (financial benefit may be found where "users are attracted to a defendant's product because it enables infringement, and that use of the product for infringement financially benefits the defendant."); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002).

The jury instruction that "a direct financial benefit may be established where infringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even significant draw," followed these cases, and *Ellison*, almost verbatim. [Tr.2619-20]. Although Robertson argues that this was error, Br. 35-36, he cites no authority and provides no substantive argument for why the widely-accepted *Ellison* rule should be rejected here. *Gershwin,* on which Robertson relies, merely restates the textbook rule that a financial interest must be "direct," 443 F.2d at 1162, the precise requirement that *Ellison* and its progeny interpret in the Internet context. 357 F.3d at 1078-79.

48

b. *Trial Evidence Demonstrated Robertson's and MP3tunes's Direct Financial Interest in Infringing Activity.*

The evidence at trial amply met this standard, demonstrating that Robertson created Sideload.com and the plugin because infringing materials on Sideload.com would draw users to purchase MP3tunes's locker subscriptions, in turn allowing him personally to profit. [Tr.1417].

The evidence demonstrated that Robertson's plan was to create a "Music Service Provider" that would compete with Apple's iTunes and other services, which he could then monetize once the user base was in place. [Tr.915-18, 934-36, 951-60, 1049-53, 1986, 1988-90, 2954-56, 3091-95:19; PX92, 151, 160, 243, 312]. The sale of locker subscriptions to users attracted by Sideload.com drove MP3tunes's growth and ultimate success, in furtherance of Robertson's goal to grab a lead in online music cloud storage services so that he could sell the company to investors. [Tr.981-84, 1005-06, 1417-18, 1991, 1998-2000, 3091-95; PX97, 113, 151, 160, 243, 312, 313, 404]. For example, the jury reviewed an email with Robertson's advice to entrepreneurs on how to build a "profitable" music service: provide digital content but "avoid costly licensing requests from the labels." [Tr.2954-56; PX243].

Robertson claims that he ultimately never realized profits from this plan. Br. at 38. But a vicarious infringer cannot avoid liability merely by failing. To the contrary, "direct financial benefit does not require earned revenue, so long as the

49

defendant has economic incentives for tolerating unlawful behavior." *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 921 (N.D. Cal. 2000), *aff'd in relevant part*, 239 F.3d 1004, 1023 (9th Cir. 2001) (financial benefit includes planned "future revenue").

Further, Robertson's argument that while *sideload.com* directly benefited MP3tunes.com, the *infringing materials* on sideload.com did not directly benefit MP3tunes, Br. at 39, is mere sophistry. There was no dispute that the vast majority of material on sideload.com was unauthorized, [Tr.485-86; PDX 36], and "popular music attracts customers." [Tr.1418]. Further, Robertson testified that sideload.com became "the most effective partner in driving traffic to [MP3tunes's] locker service." [Tr.981-84]. The jury's conclusion that this infringing material on sideload.com acted as a draw for users to purchase MP3tunes's locker subscriptions, directly benefiting MP3tunes and thus Robertson, was amply supported.

Given the close nexus between Robertson's financial interests and those of MP3tunes, Robertson may not distance himself from these direct financial benefits from the infringing activity. Robertson directed the policies that permitted the infringing activity here precisely to promote his own financial interests. Through trusts, he and others in his family indirectly owned the overwhelming majority of shares in MP3tunes, and were thus the ones who stood to benefit personally.

[Tr.942-43; D.E.120 at 15 n.2; D.E.368 at 17-18].[17]  Robertson's formalistic

contention that he did not *personally* own MP3tunes shares, therefore, is irrelevant.

Br. at 9.  A vicarious infringer cannot escape liability merely by channeling his

financial interest through an intermediary.  *See Lime Group*, 784 F. Supp. 2d at

439 (indirect ownership interest through trust can satisfy vicarious liability

element).

Where corporate officers intimately direct corporate activities and hold

significant financial stakes in companies that stand to profit from infringing

activity, they are commonly held vicariously liable.  *See e.g.*, *Lime Group LLC*,

784 F. Supp. 2d at 439; *Usenet.com*, 633 F. Supp. 2d at 158-59; *see also Disney*

*Enters. v. Hotfile Corp.*, 2013 WL 6336286, at *41-44 (collecting corporate officer

liability cases).  That result was equally appropriate here.

### 2.    The Jury's Verdict on Robertson's Contributory Liability Should Be Upheld On Appeal.

The evidence also established that Robertson knew about the ongoing

infringement on sideload.com and materially contributed to it, both by "engag[ing]

in personal conduct that is part of, encourages, or assists the infringement" and by

supplying "the software and services necessary for the infringing activities or the

operation of servers that physically store the infringing content."  [Tr.2621].  *See*

---

[17] *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997), does not help Robertson.  There, there was no evidence that the defendant did anything other than serve as president and a shareholder of a company that had infringed.  The record before the jury here, conversely, showed that Robertson's involvement was pervasive.

*Usenet.com*, 633 F. Supp. at 155 (participation is "substantial" where a defendant provides the "site and facilities" or the "environment and market" for infringing activity (quoting *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996))).

At the outset, there is no merit to Robertson's claim that the District Court erred by declining his proposed instruction that the contribution to direct infringement must be "substantial." Br. at 40-41. "Material," the term the District Court chose to use instead of "substantial," was the term *this* Court used in *Gershwin,* 443 F.2d at 1162. Moreover, the District Court had "discretion in the style and wording of jury instructions," *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 106 (2d Cir. 2001) (quotation marks omitted), and noted that "material" and "substantial" are synonyms. [Tr.2424].[18]

Robertson's argument that no reasonable jury could have found his participation substantial must yield to the evidence, which showed overwhelmingly that Robertson went far beyond merely supplying the "site and facilities" by funding and directing MP3tunes—he was the driving force behind the company in all respects. [Tr.947-48, 1281-83, 2138, 1309-10, 1314, 1414, 1425-26, 1429-30, 1462-67; PX87, 225]. Robertson personally designed MP3tunes's services and

---

[18] While Robertson also objects to the District Court's not instructing the jury that contributions must bear a "direct relationship" to the infringing activity, Br. 40, he cites no authority from this Court imposing such a requirement. In any event, he waived this objection by failing to preserve it below.

was responsible for strategic decisions. [Tr.955-56, 1426, 1462-65, 2138; PX225, 484]. Robertson directed technical operations and the marketing of MP3tunes's services, even editing the company's marketing materials. [Tr.985-86, 990-91, 993-95, 999-1001, 1003-06, 1466, 1471-73; PX81, 113, 154, 213, 236, 244, 254]. Executives with equal or less participation in their ISP's infringing activity have been held liable for contributory infringement. *See e.g., UMG Recording v. Escape Media Group*, No. 11 Civ. 8407, 2014 WL 5089743, at *25 (S.D.N.Y. Sept. 29, 2014) (noting executive's involvement in infringing ISP's control and direction before finding him liable); *Lime Group*, 784 F. Supp. 2d at 438-39 (same); *Hotfile*, 2013 WL 6336286, at *44 (same). The jury's conclusion that Robertson's participation was "substantial" was well founded.

Robertson next argues that no reasonable juror could find that his participation bore a "direct" relationship to users' infringing activity on Sideload.com. However, the evidence overwhelmingly showed that Robertson contributed to users' infringement and to MP3tunes's facilitation of that infringement. He was intimately involved in creating, developing, and marketing Sideload.com and the sideload plugin—the main tools for user infringement. [Tr.978-98, 1463-65, 1991-98; PX97, 101, 114, 255]. He personally encouraged staff and users to infringe songs on sideload.com. [Tr.1009-10, 1014, 1028-1040, 1467-68, 1473, 1955, 1957; PX90, 102, 253]. He supplied the funding for

MP3tunes, directed its development, and set all of its relevant policies, including those related to infringement. [Tr.942-43; PX141]. The jury's conclusion that Robertson's conduct was directly related to user infringement was a reasonable one.

Robertson argues next that there was insufficient evidence that he had knowledge of infringing activity. Br. at 41-43. However, as detailed in Part II.B.1, *supra*, Robertson was clearly aware of—and turned a blind eye to—significant suspected (if not known) infringement, and created Sideload.com to exploit it. Moreover, contributory liability requires only that Plaintiffs prove Robertson's *constructive* knowledge, not specific knowledge, of the infringements. *See Usenet.com*, 633 F. Supp. 2d at 154-55; *Lime Group*, 784 F. Supp. 2d at 437-38. Such evidence abounds here. Robertson had participated in the music industry for a decade. He knew that major labels were not distributing works in MP3 format, and thus knew that the library of MP3 files he offered through Sideload.com was infringing, [Tr.1044-49; PX160, 378], encouraged his employees to sideload from sites containing mainly pirated music, [Tr.1009-10, 1014; PX90], developed a feature that ranked users by how many recordings they sideloaded, [PX255; Tr.1022, 1104], competed for the top spot as "Sideload King" through his personal individual activity, [PX406, 440; Tr.1997-98], was copied on communications advising MP3tunes of extensive infringing content, [PX198, 444], and devised

54

MP3tunes's policy to ignore complaints of infringement absent a formal DMCA notice. [PX253; Tr.1038-40]. The jury was certainly entitled to disbelieve Robertson's implausible assertion that he did not know, or should not have known, that infringement was occurring.

### 3. The District Court Correctly Declined to Instruct the Jury on the *Sony* Exception.

Robertson also argues that there can be no contributory liability because Sideload.com was capable of "commercially significant non-infringing uses" under *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). In *Sony*, the Supreme Court held that the manufacturer of a VCR that had "substantial non-infringing uses" could not be contributorily liable where the only evidence of the distributor's knowledge of infringement was the fact that the product *could* be used for infringement. *Id*. at 456. A key to the ruling was that, after the sale, the manufacturer had no ongoing relationship with the purchaser, and no ongoing role in the purchaser's infringing use of the product. *Id.* at 438.

*Sony* is irrelevant here because MP3tunes, unlike Sony, had an ongoing relationship with its subscribers, and thus MP3tunes (unlike Sony) could have withdrawn contributions to known infringing activity but decided not to. *See also* Part I.A, *supra* (MP3tunes failed to address repeat infringement on Sideload.com). The so-called "*Sony* exception" therefore was inapplicable. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 132-33 (2d Cir. 2008) (noting

*Sony*'s emphasis on "the lack of an 'ongoing relationship' between Sony and its VCR customers"); *Usenet.com*, 633 F.Supp.2d at 155-56 (rejecting reliance on *Sony* because the defendants "maintain an ongoing relationship with their users"); *see also Arista Records, Inc. v. Flea World, Inc.*, No. 03-cv-2670, 2006 WL 842883, at *15 (D.N.J. Mar. 31, 2006).[19]  Therefore, the District Court correctly declined to give a *Sony* instruction.

## III.  DIRECT INFRINGEMENT ISSUES.

### A.  The District Court Correctly Sustained the Jury's Cover Art Direct Infringement Verdict.

Not only did MP3tunes use Plaintiffs' music without a license, it also unlawfully copied cover art images owned by Label Plaintiffs onto its servers.  In what the District Court recognized as an "an automated marketing ploy," MP3tunes used a software program, "Lockersync," to log in to the servers of Amazon, search for album art matching the sound recordings in users' lockers, and copy those images to MP3tunes's servers.  [D.E.368 at 11].  The evidence showed that MP3tunes made tens of thousands of infringing copies, representing at least 306 unique works.  [Tr.1479-81; PX22, 486, 489].

---

[19] Robertson in any event failed to present evidence that his posited "non-infringing uses," Br. 44, were either substantial or non-infringing.  His evidence of "free" music on third-party sites did not establish that *Sideload.com* was itself authorized to distribute it, nor did users' purchase of music from other sites authorize Sideload.com to distribute that music to its other subscribers. Moreover, although Robertson argues that MP3tunes's *locker* service had substantial noninfringing uses, that does not establish that *Sideload.com* did.

The District Court properly concluded that Label Plaintiffs owned and properly registered the images in question as works for hire, and that the copying was a direct infringement by MP3tunes, not storage of images by its subscribers that might have been protected by the DMCA.

1.    <u>Plaintiffs Properly Registered the Cover Art as Works for Hire.</u>

Label Plaintiffs proved their ownership of each cover art image at issue by proffering unrebutted copyright registration certificates, which, on their face, identified the images as works for hire. [2/25/15 Tr.20; PX489]. Those certificates were *prima facie* evidence that Label Plaintiffs owned the images and that they were works for hire. *See* 17 U.S.C. § 410(c); *Boisson v. Banian, Inc.*, 273 F.3d 262, 267 (2d Cir. 2001). Accordingly, Robertson's argument that Label Plaintiffs "did not produce documents or contracts evidencing the cover artists' work-for-hire status," Br. 34 n.2, is false: the registrations constituted *prima facie* evidence thereof and were never rebutted. [2/25/15 Tr.20].

Robertson is left with the technical argument that Label Plaintiffs registered album cover art images on Forms SR along with the album sound recordings, instead of using separate forms for visual art. The Copyright Office's instructions, however, expressly permit the use of Form SR to register both sound recordings and associated images. Copyright Office, Copyright Registration for Sound Recordings, Copyright Circular #56, at 3 (Aug. 2012). The Form SR includes

instructions for how to "include[] artwork and photographs" within the claim.[20]
There is nothing improper about consolidating registrations for works published
together onto the same form, *Greenwich Film Prods., S.A. v. DRG Records, Inc.*,
833 F. Supp. 248, 252 (S.D.N.Y. 1993). Indeed, the Copyright Office *approved*
Label Plaintiffs' registrations. [Tr.1481].

Robertson argues that 37 C.F.R. § 202.3(b)(1) defines "Class SR" to
encompass only sound recordings and "literary, dramatic, and musical works
embodied in phonorecords." Br. 32. But those same regulations expressly allow
"registration on a single application" of published works where "all copyrightable
elements that are otherwise recognizable as self-contained works, [and] are
included in a single unit of publication, and in which the copyright claimant is the
same." 37 C.F.R. § 202.3(b)(4)(i) & (i)(A). Notwithstanding Robertson's
argument, Br. 34, nothing on the registration forms limits the "work-for-hire" box
to the sound recordings or excludes the images.[21]

Moreover, even if Label Plaintiffs should have used separate forms to
register their cover art images, failure to do so would have no effect on the
registrations' validity. A copyright owner whose registration "inaccurately
denominates the basis of ownership . . . does not thereby become subject to having

---

[20] *See* http://copyright.gov/forms/formsr.pdf.
[21] Works for hire require no separate identification of artists. Copyright Office, Works Made for
Hire, Copyright Circular #09, at 1-2 (Sept. 2012).

the registration invalidated by an infringing party unless, at a minimum, the

infringing party can show that the inaccuracy was both material and made in bad

faith." *TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 549 (S.D.N.Y.

2001); *see Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 455 (2d Cir.

1989); *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984).

Congress has strengthened that presumption by extending a harmless error rule to

any technical deficiencies in a registration application.  *See* 17 U.S.C. § 411(b).  As

the District Court correctly held, absent evidence of "proof of deliberate

misrepresentation" to the Copyright Office, Robertson's contentions are nothing

more than "hyper technical quibbles with Plaintiffs' registration forms" and "do

not rebut the presumption of ownership."  [D.E.525 at 25] (citing *Fonar Corp. v.

Domenick*, 105 F.3d 99, 105 (1997)).

### 2.     MP3tunes, Not its Users, Caused the Infringing Copying.

MP3tunes designed and wrote the "Lockersync" software to copy cover art,

chose Amazon's website as the source of that cover art, decided not to obtain a

valid license,[22] and effectuated the reproduction of Label Plaintiffs' copyrighted

cover art—all without any user intervention, direction, or choice of images to copy.

[Tr.339-42].  In accordance with law of this Circuit, the jury was instructed to

"determine whether Plaintiffs have proved that MP3tunes engaged in a volitional

---

[22] Notwithstanding Robertson's repeated suggestions in his brief, an Amazon representative clearly testified (and the jury agreed) that MP3tunes did not have a license from Amazon to engage in the copying in question. [Tr.410-12].

act causing the copying of cover art images in which Plaintiffs own copyrights."

*Cartoon Network*, 536 F.3d at 131. The evidence amply supported the jury's

finding in Plaintiffs' favor. [D.E.613-1 at 40.]

Robertson's spin on these facts–that "MP3tunes designed a system that

*allowed users* to retrieve certain cover art images from Amazon.com"—is contrary

to the evidence at trial. Br. 28 (emphasis added). MP3tunes did not "allow users"

to do anything. Lockersync chose and made copies of cover art images without

user direction or input. [Tr.341-42]. Users were not even informed that

Lockersync was copying images from Amazon. [Tr.342].

The absence of user direction easily distinguishes this case from those in

which users directed devices distributed or managed by the defendant to copy

content of the users' choosing. *See Sony*, 464 U.S. 417 (VCR); *Cartoon Network*,

536 F.3d 130-33 (remote DVR). Where a user selects the works and directs a

device to copy them, the "volitional act" of copying arguably is the user's. The

jury was permitted to conclude otherwise here.

Robertson focuses exclusively on whether the copies were made

"automatically," Br. at 28. But the dispositive point here is who committed the

"volitional act" of directing the copying. *Cartoon Network*, 536 F.3d at 131.

Lockersync logged into a third-party system and itself selected the works to copy.

[Tr.339-42]. The only user input—uploading a music file—cannot constitute a

60

volitional act to copy a different file (an image) that the user did not select. The jury thus properly concluded that the relevant volitional act was MP3tunes's, not its subscribers'.

Robertson also weakly contests the sufficiency of the evidence that MP3tunes had copied the works at issue from Amazon, arguing that it was at least theoretically possible for users to upload images themselves. Br. 28-29. MP3tunes did not track the source of each image, but the evidence was still sufficient to support the jury's finding. Amazon was MP3tunes's primary source of images at the relevant time. [Tr.687-88; D.E.629 at 19.] Since each image at issue was copied dozens and in some cases hundreds of times, [Tr.348-49; PX22], the jury was entitled to conclude that MP3tunes had copied each work from Amazon at least once. *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." (quotation marks omitted)).

> 3.  The DMCA Does Not Protect MP3tunes's Own Copying and Storage of Cover Art Images.

The fact that MP3tunes, and not its subscribers, made the decision to copy and store the cover art images readily disposes of Robertson's DMCA argument. Since MP3tunes's liability for copying those images does not arise from "storage at the direction of a user," the safe harbor is not implicated. 17 U.S.C. § 512(c).

Robertson improperly reads *Viacom* as providing safe harbor to *any* software function that happens "automatically," "enhance[s] user experience," and is initiated "in response to user input." Br. 30. *Viacom* stands for nothing of the sort. In *Viacom,* YouTube facilitated access to videos that users had chosen to store on the service. 676 F.3d at 39. Here, the user chose to upload a sound recording and MP3tunes chose to provide the cover art, by its own admission, to "enhance user experience." Br. 30. Thus, unlike YouTube, MP3tunes' actions had nothing to do with "facilitating access" to content that users had stored. 676 F.3d at 39.

Indeed, Robertson's reading of *Viacom* would lead to absurd results. It would immunize a service provider who responded to a user's uploading of a song by automatically copying additional songs from the same album, all songs by the same artist, or different recordings of that song by other artists. Such an interpretation would, as the District Court held, "stretch the definition of 'storage by direction of a user' beyond the pale." [D.E.368 at 11].

## B. Substantial Evidence Supported the Jury's *Respondeat Superior* Verdict.

It was undisputed that Robertson and his executives each personally and repeatedly copied Plaintiffs' works. The evidence supported the jury's verdict that MP3tunes and Robertson were liable, under *respondeat superior*, for these specific infringing actions (which the verdict addressed separately from infringement by non-employee users) because they were for MP3tunes' benefit and committed in

the executives' capacity as employees.  This was a classic fact question resolved by the jury and should not be revisited.

The jury heard evidence that MP3tunes benefitted from the sideloading of popular tracks: such activity both increased the size of Sideload.com's index and made already-indexed tracks more prominent by increasing their sideload count. [Tr.665].  Both benefits made the index a more attractive destination for prospective users.  [Tr.367].  The jury also heard that MP3tunes executives proposed a "project" whereby its employees would "seed" the index with popular tracks.  [Tr.1359, 1413; PX114].  An MP3tunes employee admitted that she and other employees "specifically sought out websites on the Internet to locate files and sideload them into the Sideload index," and did so "as employees of MP3tunes."[23]  [Tr.1413].  Robertson himself distributed to MP3tunes employees a list of sites featuring free mp3s "for sideloading purposes."  [Tr.1009-10].  And the jury saw a list of popular works personally sideloaded by executives who accessed their accounts from MP3tunes's offices.  [Tr.367-69].

This evidence easily supported the jury's finding that the infringing copying by MP3tunes executives was to benefit the company rather than for personal amusement.  Although Robertson denied directing the copying and denied

---

[23] Robertson's claim "that she [*i.e.*, the employee]—but not that others" had engaged in such copying misstates the record; she testified that she "and other people at MP3tunes" were involved.  *Compare* Br. at 54 *with* [Tr.1413].

MP3tunes benefitted from it, the jury was entitled to discredit his testimony in view of the evidence discussed above.  [D.E.629 at 26-30.].

This same evidence also supported imputing secondary liability to Robertson.  He personally sideloaded prolifically to build up the Sideload.com index, [PX406, 440; Tr.1006-08, 1997-98], and it is no leap to conclude that his team was doing the same with his consent or at his outright direction.  Moreover, he unquestionably had the ability to direct MP3tunes's employees and stood to benefit from sideloading that made the Sideload.com index more attractive.  *See* Part II.B, *supra*.

## IV.    STATUTORY DAMAGES ISSUES.

### A.    The District Court Erred in Limiting Plaintiffs to a Single Damages Award for Infringement of the Respective Copyrights in Separately Owned Recordings and Compositions.

The Copyright Act entitles "the copyright owner" of a work to statutory damages for its infringement but also provides that a single owner of multiple derivative copyrights in the same work (for instance, a movie and its script and soundtrack) may not thereby obtain multiple recoveries.  17 U.S.C. § 504(c)(1).  Here, the District Court extended this limit to "different owners" holding

"respective copyrights in the musical compositions and sound recording of the infringed work." [D.E.609 at 1; Tr.3031-35]. This was error.[24]

The prohibition against multiple recoveries in Section 504(c)(1) limits the rights of "the copyright owner" (singular), not the rights of separate owners where the same activity has infringed each of their respective copyrights. Thus, every district court in this Circuit that has addressed the issue has interpreted the limitation to apply only when the same party owns multiple copyrights in the same work. *See TeeVee Toons,* 134 F. Supp. 2d at 548 ("where . . . the plaintiffs owning the copyrights on the musical compositions are separate from the plaintiffs owning the copyrights on the sound recording, each may recover statutory damages"); *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 435 n.7 (S.D.N.Y. 2014) (same); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 14.04[E][1][d] (2015).[25] Indeed, any other interpretation "would lead to absurd results, for it would permit separate copyrightholders of the composition and the recording, if suing separately, to each recover statutory damages, but if suing in the same action to be limited to a single award of statutory damages." *TeeVee Toons*, 134 F. Supp. 2d at 548.

---

[24] Correcting the District Court's error does not entail resubmission to the jury since the jury awarded statutory damages on a per-work basis, [Damages Verdict Sheet], and the District Court applied the reduction resulting from its ruling after-the-fact. [D.E.609 at 5].

[25] *Spooner v. EEN, Inc.*, No. 08-cv-262-P-S, 2010 WL 1930239 (D. Me. May 11, 2010), the out-of-circuit case on which the District Court relied, expressly limited its holding to situations where "the same person holds the copyright to both the sound recording and the musical composition," *id.* at *6, which is not the case here.

This reasoning aligns with the Congressional policy of providing statutory protection for works that "live their own copyright life." *Robert Stigwood v. O'Reilly* 503 F.2d 1096, 1104-05 (2d Cir. 1976) (allowing separate awards under 1909 Act for distinct, independently-exploited copyrights embodied in same infringing theatrical performance); *see also Bryant*, 603 F.3d at 140 (works treated as consolidated for statutory damages purposes only where plaintiffs themselves exploited them only in consolidated form).[26] Here, the Label and Publishing Plaintiffs are separately-owned entities each engaged in discrete businesses. They hold separately registered copyrights in separate works (recordings and compositions, respectively), each of which has been separately marketed to and exploited in distinct markets. For example, Publishing Plaintiffs have licensed their compositions separately from Label Plaintiffs' sound recordings, in sheet music, to film and television, and for reproduction in other recordings. [Tr.726-30]. Accordingly, under the law of this Circuit, Label Plaintiffs and Publishing Plaintiffs are entitled to separate awards for the infringement of the recording and the composition.

---

[26] The District Court's reasoning would also deprive music publishers of the full protection of statutory damages based on an event outside their control: whether sound recordings incorporating their compositions are recorded, which is often subject to compulsory licensing under Section 115 of the Copyright Act. *See* 17 U.S.C. § 115.

## B. The District Court Correctly Permitted Awards of Statutory Damages for Separately Exploited Sound Recordings.

The jury concluded that the same multiple-recovery prohibition did *not* bar

Label Plaintiffs from receiving statutory damages for each recording infringed, as

opposed to a single award per album, because (with some exceptions) Label

Plaintiffs had exploited those recordings separately from the albums.  The District

Court properly sustained that verdict.

The Copyright Act permits statutory damages for each work infringed.

Infringement of sound recordings is considered on a by-work basis, and not merely

as infringement of a compilation on which those recordings also appear, if they

"were issued and infringed on an individual basis."  *Arista Records LLC v. Lime*

*Group LLC*, No. 06-cv-5936, 2011 WL 1311771, at *4 (S.D.N.Y. Apr. 4, 2011).

That is true even if the recordings "were also compiled as parts of albums."  *Id*.

Thus, the question for the jury—as the District Court properly held—was whether

"plaintiff had issued the works separately," or only "together as a unit."  *Bryant*,

603 F.3d at 141.

The jury's verdict that separate awards were available for virtually all

individual recordings was amply supported by the evidence.  Label Plaintiffs

commercially exploited virtually all of their sound recordings, including each of

the specific works in suit, as separate tracks through iTunes and Amazon.

[Tr.3060; 3068-69; 3084-85].  In addition, they made virtually their entire catalog

available for streaming by online services such as Rhapsody on a "track-by-track" basis. [Tr.3061-62]. Even a casual music consumer would be aware that today, sound recordings are seldom exploited only through album sales.

Robertson's attempts to nitpick at this testimony fail. That Label Plaintiffs *could* have proved the same point using business records unique to each sound recording, as opposed to testimony about their universally-applied policies and practices, Br. at 62, does not render the evidence insufficient. And because Label Plaintiffs proved that their entire historical catalog (save enumerated exceptions) was made available from the inception of each online digital store, and that they offered each new track for online sale at the same time as its physical release, proving separate commercial exploitation at the time of infringement did not require separately naming the precise date on which each recording was released for digital sale. [Tr.3078-81]. There is no basis to revisit the jury's finding.

## V. PUNITIVE DAMAGES ISSUES.

### A. The Punitive Damages Award Comports with Due Process.

The District Court recognized that Robertson's conduct in perpetrating and facilitating copyright infringement had been intentional, culpable, and deceitful:

> Robertson[] intentionally misled users into believing their actions did not violate copyright law; facilitated the infringement of numerous works; and contributed significantly to an era of rampant digital piracy. Robertson embarked on an odyssey to exploit the copyrights of the record companies without paying for

> the privilege. . . .  Had his grandiose scheme succeeded,
> it could have siphoned billions of dollars of revenue from
> copyright owners.

[D.E.629 at 41.]  It then weighed the relevant guideposts, *see State Farm Mut.*

*Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003), and held that, on balance, an

award of punitive damages was appropriate.  The District Court's award of

$750,000, already reduced from the jury's award, should not be further reduced.

### 1.    Robertson's Copyright Theft Involved Trickery and Deceit.

Any one of the *State Farm* factors may support an award.  *State Farm*, 538

U.S. at 419.  The District Court found that Robertson's conduct met at least one —

"trickery and deceit."  *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443,

462 (1993).  Robertson "stole copyrighted material," "encouraged others to do the

same," and helped "mislead users into believing [they] had no legal liability for

sideloading songs."  [D.E.629 at 36.]  As discussed above, Robertson knew that his

company was facilitating infringing activity, and established policies to

consciously disregard it.

These actions were knowing, brazen and purposeful—precisely the type that

merit punitive damages.  *See TXO*, 509 U.S. at 462; *BMW of North America, Inc.*

*v. Gore*, 517 U.S. 559, 576 (1996).  Robertson was a sophisticated actor who had

battled the music industry for years, and had used infringing content as the basis

for multiple businesses.  Indeed, his infringing actions at MP3tunes reflected a

years-long business strategy that persisted despite Plaintiffs' repeated efforts to halt it. He even boasted that his illegal acts would "unlock about $270 billion in content"—profits that would flow into his business at Plaintiffs' expense. [Tr.934-36]. The enormity of his infringement-driven project stood to harm not only Plaintiffs, but numerous third parties as well, ranging from other copyright owners to artists. *Cf. Gore*, 517 U.S. at 575; *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007).

### 2. Robertson's Conduct Threatened Significant Harm.

The punitive damages award is proportionate to the potential harm from Robertson's actions. Robertson focuses on the ratio of the *nominal* and punitive damages awards. Br. 56, 58-59. But in cases involving nominal damages, a large ratio "has no necessary bearing on the appropriateness of the amount of punitive damages." *Payne v. Jones*, 711 F.3d 85, 102 & n.15 (2d Cir. 2013); *see Gore*, 517 U.S. at 582; *Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir. 1996). That ratio is also uninformative where, as here, attributing damages specifically to a defendant's conduct is difficult. *See Gore*, 517 U.S. at 583.

Instead, the appropriate guidepost is the "relationship between the punitive damages award and the *harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *Gore*, 517 U.S. at 581 (emphasis in original) (quotation marks omitted). The record here establishes that the potential

70

harm from Robertson's conduct was enormous: Robertson intended to grow his company into an unlicensed, on-demand music service, siphoning billions of dollars of content. Awards in comparable cases can be probative of an appropriate level of damages, *Lee*, 101 F.3d at 812, and the award here is far from excessive compared to similar cases. *See, e.g., Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 886 (5th Cir. 2013) (upholding $18.2 million punitive award for misappropriation of trade secrets); *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 512 (6th Cir. 2005) (upholding $5 million punitive award for unfair competition and misappropriation of trade secrets).

### 3. Other Factors Support the Award.

The third guidepost in *Gore*—the availability of "civil or criminal penalties that could be imposed for comparable misconduct"—also supports the award here. *Gore*, 517 U.S. at 583. As the District Court noted, New York law provides for criminal penalties for copyright infringement, including fines or imprisonment. [D.E.629 at 39.] *See Roy Exp. Co. Establishment of Vaduz v. CBS, Inc.*, 672 F.2d 1095, 1106-07 (2d Cir. 1982); N.Y. Penal Law § 275.05.[27] Against these penalties and the guideposts of statutory copyright damages, the award here is proportionate.[28]

---

[27] *Gore* and *State Farm* authorize considering the availability of such penalties, as long as they are not given undue weight. *See Gore*, 517 U.S. at 583; *State Farm*, 538 U.S. at 428.

[28] Robertson disputes looking to federal copyright law given its inapplicability to pre-1972 sound recordings (which is ironic given his reliance on a DMCA defense for infringement of these

71

Courts also may consider the need to "deter [defendant] and others from similar conduct in the future," an inquiry that can include the defendant's wealth and past conduct. *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992); *see Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1119 (2d Cir. 1986). Those factors carried particular weight here. Robertson had amassed a fortune from MP3.com and his other illegal ventures, [D.E.629 at 40], and had not been dissuaded by the $53 million judgment against MP3.com for similar infringement. [Tr.939].

In light of these factors, the District Court's analysis was entirely appropriate. There is no basis to conclude that the punitive damages award remaining after the JMOL decision was "grossly excessive."

### B. If the Court Reinstates the Secondary Infringement Verdict, the Jury's Punitive Damages Should be Reinstated.

The surviving $750,000 punitive damages award pertains only to the 31 state-law infringement and unfair competition claims remaining after the JMOL decision. [D.E.629 at 40-41 & n.18.] Indeed, the District Court's 90% reduction of the award roughly corresponded to its reduction in the state-law infringements for which Robertson remained liable following JMOL. [*Id*.]. Thus, to the extent this Court reinstates Plaintiffs' state-law claims with respect to any of the pre-1972 sound recordings affected by the JMOL decision, *see* Part I.C *supra*, the reduction

---

recordings). But the inquiry *Gore* envisions, into civil penalties available "elsewhere" for "comparable misconduct," inherently looks to laws not directly applicable. 517 U.S. at 583.

72

of the jury's punitive award should be correspondingly reversed or, at a minimum, remanded for further evaluation.

## CONCLUSION

The District Court's judgment should be affirmed in part and reversed in part.

October 5, 2015            Respectfully submitted,

*/s/ Andrew H. Bart*

Andrew H. Bart
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022
Telephone: (212) 891-1645
Facsimile: (212) 891-1699

Luke C. Platzer
J. Douglas Wilson
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile: (202) 661-4819

*Attorneys for Plaintiffs–Appellees–Cross-Appellants Capitol Records, LLC, EMI Christian Music Group Inc., and Priority Records LLC*

*/s/ Frank P. Scibilia*

Frank P. Scibilia
M. Mona Simonian

73

Ross M. Bagley
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

*Attorneys for Plaintiffs–Appellees–Cross-Appellants Beechwood Music Corp., Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music, EMI Full Keel Music, EMI Golden Torch Music Corp., EMI Longitude Music, EMI Virgin Music, Inc., EMI Virgin Songs, Inc., EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI Feist Catalog, Inc., EMI Gold Horizon Corp., EMI Grove Park Music, EMI Hastings Catalog, Inc., EMI Mills Music, Inc., EMI Miller Catalog, Inc., EMI Robbins Catalog, Inc., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., Screen Gems-EMI Music, Inc., Stone Agate Music, and Stone Diamond Music*

## SUMMARY OF CLAIMS AND DISPOSITIONS AT ISSUE[29]

| Activity | Claim | Defendant | Disposition | Section of Brief |
|---|---|---|---|---|
| Copying by Robertson | Reproduction | Robertson (direct) | Summary judgment against Robertson | Not appealed |
| Copying by other MP3tunes executives | Reproduction | MP3tunes (*respondeat superior*); Robertson (vicarious; contributory) | Jury verdict for Plaintiffs sustained on JMOL | II.B, III.B, IV.A-B |
| Copying of Cover Art | Reproduction; | MP3tunes (direct); Robertson (vicarious; contributory) | Jury verdict for Plaintiffs sustained on JMOL | II.B, III.B, IV.A |
| Infringing Copying and Streaming by Users | Reproduction; Public performance | MP3tunes and Robertson (vicarious; contributory) | Summary judgment for MP3tunes, except as to works for which Plaintiffs could prove willful blindness and/or red flag knowledge<br><br>Jury verdict for Plaintiffs<br><br>Sustained in part; reversed in part by JMOL | II.B, III.B, IV.A |
| Copying of pre-1972 Sound | Common-law copyright; unfair | (Same as federal claims | (Same as federal claims involving same activity) | II.B, III.B, IV.A |

[29] *But see* Part I.A.4 (reversal of repeat-infringer decision also requires remand on public performance claim).

| Activity | Claim | Defendant | Disposition | Section of Brief |
|---|---|---|---|---|
| recordings | competition | involving same activity) | Jury verdict for Plaintiffs; awarded punitive damages<br><br>JMOL sustained verdict in part and reversed in part<br><br>Punitive damages award reduced by remittitur | |

**CERTIFICATE OF COMPLIANCE WITH RULES 28.1(e) AND 32(a)**

I, Andrew H. Bart, hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) because this brief contains 16,467 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief bas been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman.

Date: October 5, 2015                              By:   /s/  Andrew H. Bart
                                                          Andrew H. Bart

## CERTIFICATE OF SERVICE

I, Andrew H. Bart, hereby certify that on October 5, 2015, a true and correct copy of the foregoing Proof Brief of Plaintiffs–Appellees–Cross-Appellants was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h).


Date: October 5, 2015                    By:   /s/  Andrew H. Bart
                                                      Andrew H. Bart